COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| HERIBERTO SALAS, INDIVIDUALLY | | No. 08-15-00383-CV |
| AND D/B/A ICELAND | § | |
| REFRIDGERATION, | | Appeal from |
| | § | |
| Appellant, | | County Court at Law No. 5 |
| | § | |
| v. | | of El Paso County, Texas |
| | § | |
| TOTAL AIR SERVICES, LLC, | | (TC # 2012DCV03672) |
| | § | |
| Appellee. | | |
| | § | |

**O P I N I O N**

This appeal turns our attention to the fiduciary duty that an employee may owe an employer when the employee starts a competing business. At-will employees (who have not entered valid non-compete agreements) are free in Texas to leave and form competing businesses. Even while still employed, the employee can take preparatory steps to that end. In this case, however, the employee actually ran a competing business while still drawing a salary with his employer. For the reasons stated below, we affirm the judgment obtained by the employer against the employee, subject to a suggested remittitur.

**FACTUAL SUMMARY**

Total Air Services, LLC sued its former employee, Heriberto Salas after it learned he opened and operated a competing company--Iceland Refrigeration--while still working for Total

Air.  Total Air is a heating, ventilation, and air-conditioning contractor.  Brandon Brooks and his wife, Janette Brooks, started the company in 2007.  At the time of the events we describe here, the company employed between six to twelve workers, depending on seasonal workload.  Before starting Total Air, Brandon had worked as an employee for other similar companies.  He met Salas in 2004 when they both worked for AC Experts, and he considered Salas a friend.  They both left AC Experts, but met again in 2008 when Brandon loaned Salas a set of study books so that Salas could take the test to obtain his own air-conditioning license.  Salas had intended to start his own company, though he later told Brandon he failed the test and put the issue off to the side.

Brandon met Salas again in early 2011.  Salas complained about his then employer, and asked if he and Brandon could form a partnership.  Brandon declined, but soon thereafter offered Salas a job.  According to Brandon, he hired Salas as a crew manager.  The position entrusted Salas with supervising a crew, obtaining city required permits, getting inspections completed by the city, installing air-conditioning systems, and "whatever it takes to continue the success and the growth of the company."  While Brandon prepared the quotes for all the bigger jobs, Salas occasionally had to deliver them to the customer.  Salas would also generate the numbers for some quotes.  Each bid form contained a job costing analysis that listed all of Total Air's confidential component costs. Brandon claimed that only he, his wife, and Salas were privy to that information.  Salas worked on a straight salary, and at $52,000 a year, he was the highest paid employee, including the owners.  When hired in April 2011, Salas was also the only employee paid an annual salary.

Conversely, Salas contended that he was hired as an "installer."  He acknowledged being in charge of installation jobs, but was only supervising his helper, who was his younger brother, Richard.  His job also required him to troubleshoot other jobs, and when he did so, he oversaw

2

those other jobs. He claimed to prepare quotes "every now and then" but denied he was hired to solicit sales. Salas denied that he was a "manager" but defined that term to mean setting crews up, sitting back and "just kind of supervise and stuff."

Salas worked for Total Air from April 2011 until March 28, 2012, when he and his brother resigned. This suit arose when Total Air learned that while employed, Salas had been actively competing against it. On March 31, 2011, a few weeks prior to being hired by Total Air, Salas submitted an application for a contractor's license to the Texas Department of Licensing and Regulation under the name Iceland Refrigeration (Iceland). On May 20, 2011, (at 2:25 pm during the middle of workday with Total Air), Salas filed an assumed names form with the county clerk for Iceland. Records from the Better Business Bureau, and an on-line referral site, note that Salas started Iceland in 2011. Iceland's own website similarly reflects it started business in 2011. Salas opened a bank account under his name, "dba Iceland Refrigeration" in January 2012. Iceland operates the same kind of business as Total Air -- both sell, install, and service residential and industrial air-conditioning.

Moreover, Iceland was actually doing business while Salas was still employed with Total Air. We note a few examples from the trial. Bank records show that on July 25, 2011, Salas deposited $13,600 into his personal account from a bus company for "A/C Service." Salas admitted to performing air-conditioning work for the owner of the company. A few days later, he deposited another check into his personal account for $122.50, which also indicated it was for air-conditioning services. In September 2011, Total Air had prepared a quote for a potential customer, David Grau, for an air-conditioning system costing between $13,689 to $18,634, depending on the options selected. Total Air did not get the job, but the city issued a permit the same month to Iceland to perform the work at the same address. Salas made two large cash deposits -- $4,000.00

3

on the same day the city approved a portion of the Grau job -- and another larger cash deposit, $6,500, within two weeks of when the job was completed.

Iceland also issued a February 9, 2012 quote to Santiago Soto for a job proposed between $5,995 and $6,695. Two weeks later, Iceland pulled a mechanical permit from the city to do the work. The customer wrote a check to Iceland for $7,220 for "AC/Furnace Installation" on February 27, 2012. On March 14, 2012, Iceland issued a quote to Manny Martinez for work estimated at between $5,595 and $5,895. The customer ended up paying at total of $6,381.34 to Iceland on March 27, 2012, the day before Salas resigned from Total Air. Iceland issued another quote to Robert Cervantes on March 23, 2012 for $6395; the city issued a permit for the same address and Cervantes paid for the job on April 3, 2012. Salas admitted quoting the job while he still was employed with Total Air.

The issue came to a head when Brandon became suspicious of Salas' absences in March 2012. After learning of Iceland through an internet search, he confronted Salas, who then tendered his resignation. Before that time, Salas never disclosed that he intended to go into business for himself, or was in business for himself, while employed by Total Air.

A jury found that found Salas breached his fiduciary duty to Total Air and that Total Air lost $50,000 of profits because of that breach. The jury also found that Salas acted with malice, and assessed an additional $20,000 in punitive damages. The trial court entered judgment only on the actual damages along with pre-judgment interest and court costs.

Salas brings nine issues for our review. He challenges: (1) the sufficiency of the evidence to support the liability and damages findings; (2) the trial court's formulation of the jury charge; and (3) the trial court's refusal to remit a portion of the verdict. We re-order his issues for the sake of clarity.

4

## THE COURT'S CHARGE--FIDUCIARY DUTY

Salas' sixth and seventh issues challenge how the trial court submitted the breach of the fiduciary duty to the jury. The jury was asked if Salas failed to comply with his fiduciary duty to Total Air. The question instructed the jury that as an employee, Salas owed Total Air a fiduciary duty. It further instructed that to prove its claim, Total Air must show:

1. Heriberto Salas failed to act in the utmost good faith or exercise the most scrupulous honesty toward Total Air Services, LLC; or

2. Heriberto Salas placed his own interests before Total Air Services, LLC's, used the advantage of his position to gain a benefit for himself at the expense of Total Air Services, LLC, or placed himself in a position where his self-interest might conflict with his obligations as a fiduciary; or

3. Heriberto Salas failed to fully and fairly disclose all important information to Total Air Services, LLC concerning the transactions.[1]

Salas' seventh issue specifically claims that the trial court erred by instructing the jury that Salas owed a fiduciary duty to Total Air. His sixth issue complains that the trial court refused his tendered question inquiring, "Did a fiduciary relationship of agency exist between [Salas] and [Total Air]?

## Standard of Review

We review charge error for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Financial Ins. Co. v. Ragsdale*, 166 S.W.3d 922, 926 (Tex.App.--El Paso 2005, no pet.). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003), *citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The trial court must submit in the charge all questions, instructions, and definitions raised by the pleadings

---

[1] The question followed the format suggested in STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES--BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT, PJC 104.3 (2014).

5

and the evidence. *See* TEX.R.CIV.P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999). In reviewing the charge, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex.App.--El Paso 2000, no pet.). Even if the trial court has abused its discretion, we reverse only when the error is shown to be harmful. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749-50 (Tex. 1980). "We may not reverse unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment." *Braudrick v. Wal-Mart Stores, Inc.*, 250 S.W.3d 471, 475 (Tex.App.--El Paso 2008, no pet.), *quoting De Leon*, 31 S.W.3d at 300.

## Controlling Law

Texas law recognizes two types of fiduciary relationships. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.--Dallas 2006, pet. denied). "The first is a formal fiduciary relationship, which arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex.App.--Houston [1st Dist.] 2003, no pet.), *citing Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). "The second is an informal fiduciary relationship, which may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" *Abetter Trucking Co.*, 113 S.W.3d at 508, *quoting Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). Whether an informal relationship rises to the level of a fiduciary relationship is often a question of fact. *Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). Nonetheless, "'[w]here the underlying facts are

6

undisputed, determination of the existence, and breach, of fiduciary duties are questions of law, exclusively within the province of the court.'" *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123, 147 (Tex. 1996), *quoting Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 787 (Tex.App.--Dallas 1990), *writ refused per curiam,* 803 S.W.2d 265 (Tex. 1991).

An agent generally has a fiduciary duty to act for the benefit of his principal in all matters connected with the agency. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002); *Abetter Trucking Co.*, 113 S.W.3d at 510. "Among the agent's fiduciary duties to the principal is . . . the duty not to compete with the principal on his own account . . . in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them." *Johnson*, 73 S.W.3d at 200, *quoting* RESTATEMENT (SECOND) OF AGENCY § 13, cmt. a (Am. Law Inst. 1958); *see also* RESTATEMENT (THIRD) AGENCY § 8.01 (Am. Law Inst. 2005)("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). Furthermore, an agent who uses his position to gain a business opportunity belonging to the principal commits an actionable wrong. *Abetter Trucking Co.,* 113 S.W.3d at 510, *citing Bray v. Squires*, 702 S.W.2d 266, 270 (Tex.App.--Houston [1st Dist.] 1985, no writ).

A master and servant (or employer--employee) are a species of the formal principal-agent relationship. RESTATEMENT (SECOND) AGENCY §§ 2, 25 (Am. Law Inst. 1958); RESTATEMENT (THIRD) AGENCY § 1.01 (Am. Law Inst. 2005)("The elements of common-law agency are present in the relationships between employer and employee[.]"). As such, employment relationships may impose *some* fiduciary duties. *See Johnson*, 73 S.W.3d at 201-02. Thus, when a fiduciary relationship of agency exists between employee and employer, an employee has a duty to act primarily for the benefit of his employer in matters connected with his employment. *Daniel v.*

7

*Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex.App.--Houston [1st Dist.] 2005, no pet.).

Additionally, an employee may not (1) appropriate company trade secrets; (2) solicit the former

employer's customers while still working for his employer; (3) solicit the departure of other

employees while still working for his employer; or (4) carry away confidential information.

*Abetter Trucking Co.*, 113 S.W.3d at 512; *Wooters v. Unitech Intl., Inc.*, 513 S.W.3d 754, 762-63

(Tex.App.--Houston [1st Dist.] 2017, pet. denied).

But an employee's fiduciary duty is not unlimited. "[A]n employer's right to demand and

receive loyalty must be tempered by society's legitimate interest in encouraging competition."

*Johnson*, 73 S.W.3d at 201. As a Massachusetts court (quoted approvingly by the Texas Supreme

Court) explained:

> An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Such an employee has no general duty to disclose his plans to his employer, and generally he may secretly join other employees in the endeavor without violating any duty to his employer. The general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged. If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement. The plaintiffs did not do so in this case.
>
> There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer's trade secrets. He may not solicit his employer's customers while still working for his employer, and he may not carry away certain information, such as lists of customers. Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer.

*Johnson,* 73 S.W.3d at 201-02, *quoting Augat, Inc. v. Aegis, Inc.*, 565 N.E.2d 415, 419-20 (Mass.

1991)(fiduciary duty claim against senior management at will employee who left to start own

company) [omitting internal citations to authority].

The Texas Supreme Court probed these opposing principles in *Johnson*. That case raised the issue in the context of an associate attorney of one law firm accused of steering a prospective client (and the fee which would be generated) to another firm that the associate allegedly planned to join. *Johnson*, 73 S.W.3d at 197-98. The associate attorney had obtained summary judgment on the singular ground that he did not owe a fiduciary duty as a matter of law to his law firm employer. *Id*. at 203. While noting that it was not setting a broad rule governing all employees who divert business opportunities without receiving some return benefit, the court held:

> We hold only that an associate may participate in referring a client or potential client to a lawyer or firm other than his or her employer without violating a fiduciary duty to that employer as long as the associate receives no benefit, compensation, or other gain as a result of the referral. However, an associate owes a fiduciary duty not to accept or agree to accept profit, gain, or any benefit from referring or participating in the referral of a client or potential client to a lawyer or firm other than the associate's employer.

*Johnson*, 73 S.W.3d at 203.

### Application

Salas contends that whether he owed a fiduciary duty is a jury question. We disagree. While not every employee may owe a fiduciary duty as described in the jury charge here, the trial court did not err in holding that Salas owed at least some measure of a fiduciary duty. Importantly, Salas did not object to the scope of the duty described in the charge. Rather, he claimed only that a jury had to decide whether a duty existed at all. He objected to this statement in the jury charge: "As [Total Air's] employee, Heriberto Salas, owed [Total Air], a fiduciary duty." While Salas disputes whether he performed certain job duties, those facts that are not in dispute dictate that Salas owed his employer some measure of a fiduciary duty and thus the statement in the charge is correct.

Brandon hired Salas as a crew supervisor who had the authority to pull city permits, obtain final city inspections, assist in presenting quotes, and trouble-shoot problems. Salas does not

9

contest that he performed these duties, but labels his position as an installer. Nor does Salas deny that he was a salaried employee, and in fact, the highest paid employee in the company. While Salas denied being a manager, he did so employing an overly restrictive definition of what that term means. By delivering, and at least making some quotes, he was in a position to know what work his employer was bidding on, and the price it was quoting. As is evident here, he was in a position to compete against Total Air on the very jobs that it was bidding on.

The Texas Supreme Court in *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942) held that a "trusted" salesman occupied the relationship of a fiduciary to his employer. The salesperson used his position to obtain an undisclosed benefit in the sale of his employer's property. In *Johnson*, the associate attorney moved for summary judgment solely on the basis that he did not owe any fiduciary duty to his employer. *Johnson*, 73 S.W.3d at 204. The Texas Supreme Court quickly dispensed with that argument, stating, "[w]e have no difficulty in concluding that under common-law agency principles, an associate owes a fiduciary duty not to accept a fee or other compensation for referring a matter to a lawyer or law firm other than the associate's employer without the employer's consent." *Id*. at 202. Nor do we have a similar hesitation in concluding that Salas owed a duty not to solicit for himself and accept compensation for doing the very same type work that he was salaried to perform for Total Air. It is undisputed that he did so on at least some jobs that Total Air was also pursuing.

Salas might have contested the scope of his agency, and particularly whether his job included generating new work for the firm. *See National Plan Adm'rs, Inc. v. Natl. Health Ins. Co.*, 235 S.W.3d 695, 700-02 (Tex. 2007)(party raising the question of whether it owed a general fiduciary duty or one limited to specific obligations); RESTATEMENT (THIRD) AGENCY § 8.01, cmt c (Am. Law Inst. 2005)(noting the scope of the duty is not "monolithic in its operation" and may

vary depending on the parties' agreement). Yet the question and instruction that Salas submitted (and which is the basis of his sixth issue) would not reach that issue. It only asks whether a fiduciary relationship exists at all. Nothing in the tendered instruction inquired about the scope of the relationship, or whether sales and solicitation were within the scope of Salas' duties.[2]

We conclude that the trial court did not abuse its discretion by instructing the jury that Salas owed a fiduciary duty to his employer.[3] Nor did the trial court err in refusing Salas' tendered question and instruction. We overrule Issues Six and Seven.

## SUFFICIENCY OF THE EVIDENCE

Salas' first five issues all challenge either the legal or the factual sufficiency of the evidence to support the jury's findings. We first take up his challenge to the liability question (Issue Two) and then address the challenges to the damage finding (Issues One, Three, Four, and Five).

### Standard of Review

The test for legal sufficiency of the evidence "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact finder] to reach the [result] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008); *El Paso Independent School Dist. v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). We

---

[2] Salas' requested question ("Did a fiduciary relationship of agency exist between [Salas] and [Total Air]?) is accompanied by this requested instruction:

> An agent is a person who contracts to act on behalf of a principal and is subject to the principal's right of control except with respect to the agent's physical conduct. *Royal Mortg. Corp. v. Montague*, 41 S.W.3d 721, 733 (Tex.App.--Fort Worth 2001, no pet.)[.] An agent is authorized to act on behalf of the principal when the principal has granted the agent authority to act and there is a meeting of the minds about the nature of their relationship. *Carr v. Hunt*, 651 S.W.2d 875, 879 (Tex.App.--Dallas 1983, writ ref'd n.r.e.) [citations included as part of the requested instruction].

[3] We note again that Salas did not object below, nor challenge on appeal, how the trial court formulated the scope of the duty, and that issue is not before us today.

11

credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 827. An appellate court will sustain a legal sufficiency or "no-evidence" challenge, if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810.

When reviewing the factual sufficiency of the evidence we consider all the evidence, including that which tends to prove the existence of a vital fact, as well as evidence to the contrary. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex.App.--El Paso 2005, no pet.). We will not reverse for factual sufficiency unless the trial court's finding was so against the great weight and preponderance of the evidence that it was manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Sotelo*, 170 S.W.3d at 787. This court is not a factfinder. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id*.

## Sufficiency of the Liability Finding

In his second issue, Salas contends the evidence is factually insufficient to support the liability finding. The jury found that Salas failed to comply with his fiduciary duty to Total Air. To sustain that finding under the charge, we look for evidence that Salas placed his own interests before Total Air, or used his position to gain a benefit for himself at the expense of Total Air, or placed himself in a position where his self-interest might conflict with his obligations to Total Air. The evidence sufficiently supports one or more of those alternatives.

12

Considering the evidence favorable to the verdict, Salas set up and actually operated a company in the very same market as his employer. He would necessarily have been conflicted about where to direct business. Moreover, the evidence shows that Salas actively competed against Total Air on several jobs.

We also note that Total Air submitted a bid to David Grau, only to have Salas obtain the very same job through Iceland, as evidenced by city permits for the same customer. As another example, Total Air submitted a bid on March 14, 2012 to the Center for Employment Training ("CET") for heating and cooling classrooms. Brandon along with his estimator, as well as Salas and his brother, participated in generating this quote. They toured the building, took measurements, and according to Brandon, collectively arrived at a $29,378.21 bid. The next day, and while still in the employ of Total Air, Salas provided CET a competing Iceland quote of $34,000.00 for the same job.[4] Iceland ultimately got the job and completed the work shortly after Salas resigned from Total Air. Brandon also testified that part of Salas' duties included passing out flyers door to door to solicit business for Total Air. According to Brandon, Salas would also pass out Iceland business cards at the same time, or even go back to customers for whom Total Air had submitted bids, and solicit for Iceland several days later. Although he equivocated at times, Salas admitted that he competed against Total Air while still its employee.[5] Salas did not contest

---

[4] Iceland's bid included different air-conditioning units which explains why it was somewhat higher.

[5] When called adversely to the stand, Salas testified:

> [ATTORNEY]: Iceland Refrigeration, you agree with me, is a competitor of Total Air Services, correct?
> [SALAS]: Yes.
> [ATTORNEY]: It's a competitor now, yes?
> [SALAS]: Yes.
> [ATTORNEY]: It was a competitor whenever you started it, right?
> [SALAS]: They can see it like that.
> [ATTORNEY]: Yes or no?
> [SALAS]: A. Yes.

that Iceland bid for, and obtained several jobs while Salas worked for Total Air. He claimed getting work was not part of his job, and any Iceland work he did was done in his off-hours. Salas also viewed the people he solicited as his friends and contacts. Yet for the CET job, the jury could have concluded that he met the contact person when he and the other Total Air employees were there to formulate Total Air's bid. When he met the contact, Salas volunteered that he had his own license, and submitted his own bid the next day. In that way, he used his position with Total Air to gain a benefit for himself.

We might agree that some of Salas' conduct -- obtaining a license, or filing an assumed name certificate -- were preparatory acts and thus permitted. Taking the next step and actually conducting a competing business in the same market, and at times soliciting the very same customers that his employer was pursuing, goes well beyond a preparatory act. The conduct is by definition "compet[ing] with the principal on his own account . . . in matters relating to the subject matter of the agency[.]" *Johnson*, 73 S.W.3d at 200.

Salas' factual sufficiency challenge claims that the jury incorrectly considered an employment handbook and disregarded the at-will nature of the employment relationship. In October of 2011, some six months after he started with Total Air, Salas signed an acknowledgment of an employee handbook containing these policies:

> We respect the right for employees to hold second jobs but require that such employment not interfere with your performance or attendance at Total Air. Also, your second job may not be with one of our competitors. This company does not permit anyone to perform any work of the same type as ours for other employers or individuals during off-hours. . . . [and must also be cleared with a manager]

> I will not compete with the company by offering similar services, working for the competition, or using company assets or knowledge to benefit my own personal interests.

> I will act in the best interest of the company and will not let my loyalty be influenced by outside interests or relationships that could jeopardize the company's reputation or my own personal integrity.

14

The handbook further admonishes that all employees are "at will" and the employee handbook does not constitute an employment agreement.

The Texas Supreme Court in *Johnson* concluded that an employer's policies did not add to the fiduciary duties owed by employees. *Johnson*, 73 S.W.3d at 203 ("But a contractual obligation does not generally give rise to a fiduciary duty."). Total Air's employee handbook, however, was admitted without objection, or any kind of limiting instruction, and Salas makes no separate claim that the trial court erred in admitting the handbook. Once admitted, the provisions of the handbook were admissible for all purposes. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 143 (Tex. 2004); TEX.R.EVID. 105(a). The jury could have considered them as a promise by Salas not to engage in the described conduct from the time he acknowledged the policies, and we thus reject Salas claim that the jury improperly relied on the handbook.

Nor do we find the "at will" nature of Salas employment determinative. Salas suggests that an at-will employee cannot breach a fiduciary duty by moonlighting in the absence of a binding contractual obligation to the contrary. The fiduciary duty arises out the agent and principal's relationship, and not as a matter of contract. The associate attorney in *Johnson* appears to have also been an at will employee. Yet the court had no problem in stating he had a fiduciary duty not to refer prospective clients for personal gain to the detriment of his employer. *Johnson*, 73 S.W.3d at 202. The record supports that Salas did just that while employed with Total Air. We overrule Issue Two.

### Evidence of Damages

Salas next challenges the legal and factual sufficiency of the evidence supporting the jury's award for lost profits in the past. Lost profits are recoverable for a breach of a fiduciary duty when it is shown that the loss is the natural and probable consequence of the complained of act. *Texas*

15

*Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); *Miller v. Argumaniz*, 479 S.W.3d 306, 311 (Tex.App.--El Paso 2015, pet. denied). In reviewing the legal sufficiency of a lost profits award, we must determine whether the amount awarded was established with reasonable certainty through competent evidence. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 50 n.3 (Tex. 1998). "When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Id., citing Texas Instruments*, 877 S.W.2d at 279-81. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained, although the loss need not be susceptible to exact calculation. *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *Argumaniz*, 479 S.W.3d at 311.

Total Air's damage model starts with the claim that Iceland grossed $125,951.05 during and shortly after Salas's employment with Total Air. The total $125,951.05 can be divided into three categories of jobs: (1) those that Iceland obtained while Total Air was actively pursuing the same work; (2) those that Iceland performed where Total Air had no particular connection with the customer, but than Salas could have steered the work to Total Air; and (3) unexplained cash deposits by Salas that Total Air contends were for air conditioning work. Total Air then multiplied the total from all three categories by its usual 40% profit margin to arrive at its lost profits ($50,380.04). The jury appears to have largely accepted that model, awarding $50,000 in lost profits.

Salas' factual and legal sufficiency challenges in varying ways complain that the evidence cannot sustain the total award. He claims that Total Air did not show that it would have gotten any of the jobs itself, and thus Salas was not a substantial cause of any lost profits (Issues One and

16

Three). He alternatively claims in his fourth issue that the amount is excessive, and the jury at most could have awarded the profit that Total Air might have made on its $29,378.21 bid to CET and the "$4,000 Salas collected on the David Grau job" (resulting in a total net profit of $13,351.28). Finally, Issue Five contends that because there is no evidence of a total sum of $50,000 in lost profits, the entire award must be deleted.

We find it useful to consider the three categories of jobs separately. For the first category -- those where Iceland affirmatively competed against Total Air -- we find the evidence sufficient to support at least a portion of the total lost profits claim. Total Air had a pending bid of between $13,689.00 and $18,634.00 to potential customer David Grau. Based on city permits, Iceland obtained and completed the job while Salas was still employed with Total Air. Salas did not produce its project file on the job, but Salas made large cash deposits totaling $10,500 within days of an interim city inspection and the date the job was completed. Two other jobs in this category involve internet referrals through a service known as Service Magic. Total Air paid a fee to the service for the names of potential customers that described needed work. In March 2012, Service Magic provided the names of two persons to Total Air who needed air-conditioning work. Iceland, who also signed up to the same service, bid on and obtained jobs for both customers in March 2012. The two bids total $12,596.34 ($6301.34 and $6,295). The last job in this category includes the CET bid that Total Air bid upon, but which Iceland obtained for $34,000. Totaling these jobs, Iceland generated gross revenue of $57,096.34, and based on a profit margin of 40%, Total Air lost a net profit of $22,838.53.[6]

---

[6] The jobs include the $10,500 attributable to the Grau job, Manual Martinez ($6,301.34), Keith Polette ($6,295), and the CET ($34,000). We use the final amount of the contract, and not the bid, as that is the best representation of the value of the work for which the customer would actually contract.

The second category were those bids made to persons with whom Total Air had no apparent connection. As an example, while employed with Total Air, Salas submitted a bid for Iceland to a bus company for $13,600.00. He knew the owner and learned of the potential business through that friendship. Unless Salas had directed the work to his employer, there is no suggestion that Total Air would have known about, bid upon, or obtained the work. In this way, these jobs are akin to the referral in *Johnson*. The associate attorney in *Johnson* had a personal friendship with the decision maker and consulted with the decision maker on where to direct the lawsuit. 73 S.W.3d at 197. And like in *Johnson*, we would not hold Salas to a duty to refer friends or family to his own employer. He might legitimately believe they could be better served elsewhere. But neither could he direct the work to himself and profit to the exclusion of his employer. We find the evidence sufficient to include this category of jobs as those that Total Air could have obtained but for Salas' breach. The jury could have inferred from Salas' relationship with these persons that he could have directed the work to Total Air, had he chosen to do so. The total jobs in this category generated gross receipts of $29,752.50, and a net profit of $11,901.[7]

The last category presents the closest question. Total Air obtained Salas' banking records. The records showed several large cash deposits while Salas worked for Total Air. Salas was paid a gross salary by Total Air of $1000 a week, which after deductions yielded a paycheck of $778.50. Yet Salas made *cash* deposits, in odd amounts throughout the time of his Total Air employment. Total Air linked some of these amounts to particular jobs, through either bids, or city permits. However, for many of the deposits, it had no such connecting evidence. It asked the jury to first assume that that these were Iceland jobs. Next, it asked the jury to assume that Salas could have directed the work to Total Air.

---

[7] These jobs include the Los Paisanos Bus Company ($13,600), Veronica Macias ($122.50), Santiago Soto ($7,220), Robert Cervantes ($6,395), Maria Salas ($2350), and Maria Mata ($65).

Salas himself testified that for the most part he did not recall the source of the deposits. As to one deposit, he speculated that it might have been his $5,000 tax refund. For another series of deposits, he testified it was for work he did for a relative that had nothing to do with air-conditioning. He also testified to doing odd jobs in other trades in his spare time. Finally, Salas claimed that he usually cashed any check, including his paycheck, at the issuing bank and then deposited the cash funds in his own bank. He also suggested the odd amounts could have been from several paychecks that he deposited all at once.[8]

While we agree that the jury could have discounted Salas's explanations, we nonetheless conclude that the evidence is insufficient to allow the jury to conclude that the deposits were necessarily related to air-conditioning jobs, much less for customers who would have hired Total Air. At least for the second category of jobs that we describe above, the jury heard some evidence about the nature of Salas' relationship with the customer, such that the jury could infer that Salas could have directed the work to Total Air. But we can make no such leap for unknown jobs for unknown customers under unknown circumstances. As the Texas Supreme Court has cautioned, "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Johnson.*, 73 S.W.3d at 210, *quoting Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 & n.3 (Tex. 1993). We thus sustain Issue Four to the extent it seeks a remittitur, and we suggest that in lieu of a new trial, Total Air accept $34,739.53 as the total for lost profits. *See* TEX.R.APP.P. 46.3.

---

[8] The only paychecks actually deposited into his account were from his wife's employer. The frequency and amounts of the cash deposits do not fit any clear pattern. For instance, in May 2011, Salas would have netted approximately $3114 from his weekly salary. Yet he deposited only $2000 into his account that month (excluding his wife's salary check). In July 2011, however, he deposited $22,424.71 in cash to his account, which greatly exceeded his salary. He made no cash deposits in June, August, or October. Total Air did not attempt to reconcile the total amounts deposited against the total that it paid Salas to determine if there were a discrepancy.

19

In Issue Five, Salas challenges the legal sufficiency of the evidence to support the $50,000 award. Because we have found that there is evidence to support a portion of the total award, we will not render judgment for Salas on a "no evidence" point. *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010). At most, we would consider a remittitur. *Id.* Because we have sustained Issue Four and suggested a remittitur, we overrule Issue Five as moot.

## ADDITIONAL CHARGE OBJECTION

In Issue Eight, Salas faults the trial court for not including this instruction in the charge:

> For Lost Profits to be recoverable in this case, they must naturally and proximately arise from the defendant's wrong. In other words, they must be a foreseeable consequence of the Defendant's misconduct. [internal quotations and case citations omitted].

However, the trial court did instruct the jury it should only award damages that are "proximately caused" by the conduct it found in the liability question. Proximate cause was in turn defined in the charge:

> 'Proximate cause' means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom.

Every aspect of Salas' requested instruction was already contained in the proximate cause instruction actually given to the jury. Question Two of the court's charge required that the damages awarded be proximately caused by the conduct. The definition of proximate cause then instructed the jury on foreseeability. Because Salas fails to convince us that his requested instruction was necessary or added anything to the charge, we overrule Issue Eight.

## MOTION FOR NEW TRIAL

Finally, Salas complains in Issue Nine that the trial court abused its discretion in not granting that portion of his motion for new trial seeking a reduction of the damages awarded. We

20

have agreed in part with the same argument advanced under Issue Four, and thus overrule Issue Nine as moot.

## CONCLUSION

We overrule Issues One through Three, and Five through Nine. We sustain Issue Four, but only to the extent that we suggest a remittitur of $15,260.47 ($50,000 minus $34,739.53) and a proportionate adjustment to prejudgment interest. If a remittitur in this amount is filed by Total within fifteen days of the date of this opinion, we will modify the judgment with respect to the damages awarded and affirm as modified. Absent the remittitur, we remand for a new trial.

February 14, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

21