**Opinion issued July 25, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00414-CV

————————————

## ALLEN GERARD HOLLIMON, Appellant

## V.

## VALENCIA LANA WILLIAMS, Appellee

On Appeal from the 280th District Court
Harris County, Texas
Trial Court Case No. 2022-23766

## MEMORANDUM OPINION

Appellant, Allen Gerard Hollimon, challenges the trial court's issuance of a final protective order prohibiting him from, among other things, committing family violence against, communicating with, threatening, and going within 500 feet of appellee, Valencia Lana Williams. In his sole issue, Hollimon contends that the

evidence is legally and factually insufficient to support the trial court's issuance of the final protective order.

We modify the trial court's order and affirm as modified.

**Background**

On April 20, 2022, Williams, a resident of Houston, Harris County, Texas, filed an application for a protective order against Hollimon, alleging that she and Hollimon "are or were dating." According to Williams, Hollimon had previously been charged with and convicted of the offense of assault involving family violence in Fort Bend County in August 2011, February 2016, and March 2016. Williams also alleged that at the beginning of 2022, Hollimon "said he [would] not stop chasing [her] until he passe[d] away" and he "acknowledged that he [was] following [her]." She requested that the trial court issue a protective order prohibiting Hollimon from, among other things, stalking, following, or engaging in conduct specifically directed toward her that was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass her, and to suspend any license he held to carry a firearm.

At the hearing on her application for a protective order, Williams testified that she and Hollimon "dated briefly" in 2016 or 2017. On April 19, 2019, Williams "pulled [her] credit report" and discovered that Hollimon "had taken" her driver's license number and social security number and used "his business[,] Hollimon

Transportation[,] to run [her] credit" information. Williams "called [Hollimon] and asked him why" he had done that, and Hollimon "cussed [her] out" and "yelled at [her]." Williams replied that she "was going to contact the authorities." She filed a report with law enforcement and looked into Hollimon's criminal record. She "saw that he had three criminal offenses, domestic violence offenses against women."

Williams further testified that Hollimon owned a company, "Nationwide Investigations," that "investigate[d] people." The "employees that work[ed] for [Hollimon]" followed "whoever they[] [were] supposed to follow at his command and t[ook] photos and d[id] . . . all that kind of stuff." Williams "would see [Hollimon's] employees" in their company cars when she was out driving. The employees "would pull up" beside or behind her car.

By January 2022, she had grown "tired of th[e] harassment," so she sent Hollimon a text message. She asked him, "How long are you going to chase me. Are you tired yet?" Hollimon responded, "No, I'll get rest when I pass away. I'll stop chasing you when I pass away." Williams texted back to Hollimon that he was "just chasing a dream that w[ould] never manifest," and she "asked him to stop it." Hollimon repeated that he would "get rest when he passe[d] away." The trial court admitted a copy of Williams and Hollimon's text message conversation into evidence.

3

According to Williams, since the January 2022 text message conversation with Hollimon, Hollimon's employees kept "showing up" places where she was, even when Williams was "in traffic." The employees would "come on the side" of her car and "acknowledge and look into" her car. "Some of them looked in [her] vehicle" and waved. Williams estimated that between January and May 2022, there had been over thirty such encounters with Hollimon's employees. Hollimon's employees had also "show[n] up" at the home of her thirty-year-old son's home.

Additionally, Hollimon had "made contact with [Williams] on several occasions" after January 2022. He "asked if he could . . . stick it in [her]," meaning that he wanted to have sexual intercourse with her. Hollimon also stalked Williams on social media. Williams became aware that Hollimon could view her Facebook[1] account when he sent her a photograph "of him laying [sic] in [a] bed" in the same position as a photograph she had posted on Facebook of herself laying in a hotel bed. She believed that he wanted to "let [her] know that he had been on [her] social media

---

[1]     Facebook, Inc. is an online social media and social networking service company. In general, the Facebook service can be accessed from devices with Internet connectivity, such as personal computers, tablets[,] and smartphones. After registering, users can create a customized profile [page] revealing information about themselves. Users can post text, photos and multimedia of their own devising and share it with other users as friends[.]

*Jeansonne v. State*, 624 S.W.3d 78, 90 n.13 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (alterations in original); *see also Woodhouse v. United States Gov't*, No. 2:21-cv-06372-SB, 2021 WL 6333468, at *8 n.6 (C.D. Cal. Nov. 24, 2021) (order) (noting Facebook, Inc. has changed its name to Meta Platforms, Inc.).

page watching [her]." After those incidents, which occurred in "[e]ither February [or] March" 2022, Williams "realized that [Hollimon] mean[t] exactly what he [said], that he w[ould] not stop until he passe[d] away." She blocked Hollimon's number on her telephone, blocked his access to her social media accounts, "blocked him through every single outlet that [she] could possibly block him from," and decided to apply for the protective order.

After she filed her application for a protective order, Williams continued to "receiv[e] anonymous phone calls" with "no caller ID" on her "business line." The caller would call and then "hang[] up."

Hollimon testified that he did not recall having sent any recent text messages to Williams. Williams "text[ed] [him] out of the blue" around January 2022, and she "drove up on [him]" once while he was golfing at Hermann Park. But he had "no interest in reaching out to her on any type of level." He did not recall making the statement that he would not stop chasing Williams until he passed away, and he denied chasing her. When confronted with a copy of his and Williams's January 2022 text message conversation, Hollimon repeated that he did not "recall."

Hollimon also testified that he "d[id not] remember sending [Williams] a photo [of him lying on a bed] at all." And according to him, Williams's testimony about such an incident was "inaccurate." "[T]o [his] knowledge," he had not had any conversations with Williams on social media. He could not recall the last time

that he had contacted Williams. He had not "reached out to [her]" in "[f]ive years, four years at least."

Hollimon did acknowledge that he had a "security business" called "Nationwide Investigations and Security" ("NIS") for about twenty-four years, and it had "about 300 employees [a]nd about [twenty] cars."[2] The car doors were "marked Nationwide Investigation" on "both sides." The NIS employees drove the company cars around Houston and other parts of Harris County. Hollimon denied having ordered any of the NIS employees to harass Williams.

Hollimon also testified that in Houston, the NIS employees did not "do investigations." They were "security guards" and "provide[d] security guard services" for "several accounts around the city." NIS conducted investigations, but "[n]ot in the city of Houston."

As to NIS's investigative services, Hollimon explained that a person who wanted to use them "ha[d] to call [his] office" and "enter into a contract." The specific services NIS provided depended on "the client and whatever they want[ed] to request. Some of the clients just want[ed] background checks, others . . . want[ed] surveillance." The services requested could include taking photographs. Hollimon

---

[2]    Later in his testimony, Hollimon clarified that "Sonya Timms" was "[t]he owner of [NIS]" and he was "a CEO" and managed the day-to-day operations. He was not related to Timms and did not have a dating relationship with her; they were "friends."

6

further explained that because NIS was a "licensed agency," he did not need an individual's permission to perform a background check, which included checking the individual's criminal history, marriage history, and licensing. Hollimon elaborated that NIS held a "class C license" under which it could "provide investigations, alarms and security guards."

Hollimon further testified that he owned another company, Hollimon Transportation, which bought and sold cars. Hollimon Transportation would "pull credit" reports "on individuals who are interested in purchasing a vehicle." According to Hollimon, Williams and her son "applied . . . to purchase a vehicle." He was "not sure" and did not recall the make and model of car that they had wanted to buy. And he did not recall when Williams and her son had visited Hollimon Transportation because "it was so long ago." Hollimon was not there when Williams came in "but [s]he talked with [his] salesman . . . to purchase a deal," which "came after the fact when they didn't qualify." According to Hollimon, there were "some shenanigans going on with that purchase."

Hollimon also testified that he did not know if Williams owned a car on January 29, 2019. Williams, who represented herself in questioning Hollimon, stated that on that date, she owned "a Mercedes Benz White E Class, so there would be no need for [her] to apply for credit" at Hollimon Transportation. According to Hollimon, though, Williams "came to purchase a vehicle not for herself but for her

son, and they talked" to Andrew McFoland, the salesman at Hollimon Transportation, who "took the information and processed their application." When Hollimon was asked whether he had any written proof, such as a credit application, to show that Williams and her son had visited Hollimon Transportation, Hollimon responded, "[w]e should have that." But he had not "looked at the files" and did not know "how long the[] [company] ha[d] to keep those records," so he was "not sure" whether he had a credit application from Williams, but he "absolutely d[id] have witnesses . . . who [had] accepted their application."

Hollimon also stated that at the time of trial, NIS had two investigators and five company cars in Houston. The other cars were either at Hollimon Transportation or NIS's "corporate office." "They [we]re stored." Hollimon explained that he had an arrangement with Timms in which NIS would store its company cars at Hollimon Transportation for "maintenance and repairs."

At the conclusion of the hearing, the trial court made the following findings:

- Williams and Hollimon "were previously involved in a dating relationship";

- There were "reasonable grounds to believe" that Williams was "a victim of stalking and harassment pursuant to [Texas Penal Code sections 42.07 and 42.072] and [Texas Code of Criminal Procedure] [c]hapter 7B";

- A protective order was necessary for Williams's "safety and welfare" and was in her "best interest and for the prevention of any further" misconduct by Hollimon; and

8

- There was "good cause" to make the protective order a "no contact protective order" and there was "no reason" for Williams and Hollimon to "have any further communication."

Following the hearing, the trial court signed a final protective order that included the findings made at the hearing as well as a finding that Hollimon "ha[d] committed family violence and [wa]s likely to commit family violence in the future." The trial court also ordered that Holliman was prohibited from communicating a threat to Williams, either directly or through any person; "[c]ommunicating in any manner" with Williams; "[g]oing within 500 feet" of Williams's residence, place of employment or business, or any location that she frequently visited; and "[e]ngaging in conduct directed specifically toward [Williams] that [wa]s reasonably likely to harass, annoy, alarm, abuse, torment, or harass her." Further, the trial court prohibited Hollimon from "[p]ossessing a firearm or ammunition," and it suspended Hollimon's firearm license. And the trial court barred Hollimon from using "his investigation licenses to gain access to" any of Williams's "confidential or financial information" and from "directly or indirectly" allowing NIS or Hollimon Transportation "to access any" of Williams's "personal or financial information." The trial court made its protective order effective for ten years.

## Standard of Review

We review the sufficiency of a trial court's findings supporting a protective order under the same standards we use in evaluating the sufficiency of evidence

9

following a jury verdict. *See Lei Yang v. Yuzhuo Cao*, 629 S.W.3d 666, 670 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Johnson v. Garcia*, No. 14-18-00397-CV, 2019 WL 4021886, at *3 (Tex. App.—Houston [14th Dist.] Aug. 27, 2019, no pet.) (mem. op.). When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822.

When a party attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Estrada v. Cheshire*, 470 S.W.3d 109, 120 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). In conducting a factual-sufficiency review, we examine, consider, and weigh all

evidence that supports or contradicts the fact finder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).

We are mindful that the trial court, as the fact finder in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Thus, the trial court may choose to believe one witness and disbelieve another. *McKeehan*, 554 S.W.3d at 698; *see also City of Keller*, 168 S.W.3d at 819. It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder.[3] *See McKeehan*, 554 S.W.3d at 698.

---

[3]     Hollimon notes that Texas's intermediate courts of appeals "are split on the proper standard of review applicable to the appeal of a protective order." Some have applied an evidentiary-sufficiency standard, while others have applied an abuse-of-discretion standard. *Compare Gabel v. Gabel-Koehne*, No. 01-20-00261-CV, 2022 WL 904629, at *7 (Tex. App.—Houston [1st Dist.] Mar. 29, 2022, no pet.) (mem. op.) (applying legal- and factual-sufficiency standards to review findings supporting protective order), *with In re Epperson*, 213 S.W.3d 541, 542–43 (Tex. App.—Texarkana 2007, no pet.) (reasoning abuse-of-discretion standard applies to review protective orders because it applies to review other forms of injunctive relief); *see also Cox v. Walden*, No. 13-20-00283-CV, 2022 WL 120014, at *5 (Tex. App.—Corpus Christi–Edinburg Jan. 13, 2022, no pet.) (mem. op.) (stating appellate court reviews provisions included in protective order under Texas Family Code sections 85.021 and 85.022 for abuse of discretion). Our own precedent dictates that we apply the legal- and factual-sufficiency standards of review. *See Vinzant v. Helduser*, No. 01-21-00633-CV, 2022 WL 3588756, at *5 n.5 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.) (mem. op.). Hollimon does not assert that the application of an abuse-of-discretion standard would

11

## Sufficiency of Evidence

In his sole issue. Hollimon argues that the trial court erred in issuing the final protective order because the evidence was legally and factually insufficient to support the trial court's finding that he acted "knowingly," as required under Texas Penal Code section 42.072 as well as the trial court's finding that he had committed family violence and was likely to commit family violence in the future.

A person who is a victim of stalking under Texas Penal Code section 42.072 may apply for a protective order under Texas Code of Criminal Procedure chapter 7B "without regard to the relationship between the applicant and the alleged offender." TEX. CODE CRIM. PROC. ANN. art. 7B.001(a)(1). The trial court must issue a protective order if it finds "reasonable grounds to believe" that the applicant is the victim of stalking by the respondent. *See id.* art. 7B.003(b); *see id.* arts. 7B.051–.053.

> A person commits the offense of stalking if the person:
>
> (a)    . . . on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:
>
>> (1)    constitutes an offense under [Texas Penal Code] [s]ection 42.07, or that the actor knows or reasonably should know the other person will regard as threatening:

---

probably result in a different outcome, so we adhere to our precedent without further analysis. *See* TEX. R. APP. P. 44.1.

(A)    bodily injury or death for the other person;

(B)    bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or

(C)    that an offense will be committed against the other person's property;

(2)    causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3)    would cause a reasonable person to:

(A)    fear bodily injury or death for himself or herself;

(B)    fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;

(C)    fear that an offense will be committed against the person's property; or

(D)    feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

TEX. PENAL CODE ANN. § 42.072(a); *see id.* § 42.07(a) (setting out elements of offense of harassment); *see also Shoemaker v. State ex rel. C.L.*, 493 S.W.3d 710, 716 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

Hollimon argues that the evidence does not show that he was "stalking" Williams because Williams only testified about one text message conversation, which she initiated with him in January 2022, and she admitted that she had "no

13

other conversations" with Hollimon. But in this one text message conversation, a copy of which was admitted into evidence at trial, Hollimon told Williams that he "would not stop chasing [her] until he passe[d] away." Hollimon also asserts that Williams "never saw" Hollimon himself, only NIS employees driving company cars. But as "CEO" or owner of NIS, Hollimon had the right to control its employees' activities while they were at work. *See Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 779 (Tex. 2021) (employer necessarily has right to control its employee's work); *see also Salas v. Total Air Servs., LLC*, 550 S.W.3d 683, 690 (Tex. App.—El Paso 2018, no pet.) (employer-employee relationship is "a species of the formal principal-agent relationship"). Williams testified that the "employees that work for [Hollimon]" followed "whoever they[] [were] supposed to follow at his command," and she stated that from January until May 2022, when the trial court held the hearing on Williams's application for a protective order, she had over thirty encounters with NIS employees driving company cars, during which they would "come on the side" of or the back of her car, "look into" her car, and wave at her. Further, Hollimon testified that NIS had only five company cars operating in Houston. Thus, the evidence of the frequency with which the encounters between Williams and the NIS employees occurred and the employees' conduct when they drove near Williams, coupled with the fact that relatively few company cars operated

in Houston, supports a reasonable inference that Hollimon acted knowingly in directing the employees to engage in such conduct.

Additionally, although Hollimon points out that in his testimony he denied having ever ordered any of the NIS employees to follow, harass, or bother Williams, the trial court evidently resolved the conflict raised by Hollimon's testimony on that issue in favor of Williams, and we may not disturb the trial court's credibility determination. *See McKeehan*, 554 S.W.3d at 698; *see also City of Keller*, 168 S.W.3d at 819.

Accordingly, we hold that some evidence supports the trial court's finding that Hollimon knowingly caused Williams to "feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended." *See* TEX. PENAL CODE ANN. § 42.072(a)(3)(D); *City of Keller*, 168 S.W.3d at 810. We further hold that the trial court's finding that Hollimon knowingly caused that result is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Estrada*, 470 S.W.3d at 120.

As to Hollimon's complaint that the evidence does not support the trial court's finding that he had committed family violence and was likely to commit family violence in the future, we note that the Texas Family Code defines "family violence" as:

> (1)    an act by a member of a family or household against another member of the family or household that is intended to result in physical

15

harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault; [or]

. . .

(3)    dating violence, as that term is defined by [Texas Family Code] [s]ection 71.0021.

TEX. FAM. CODE ANN. § 71.004(1), (3).

When asked at the hearing about whether she had experienced any family violence issues, Williams stated that she had "pulled [Hollimon's] background check and saw that he had a history of violence against women." Williams further testified that she had looked up Hollimon's criminal record and found that he had been convicted of three "domestic violence offenses against women." But because Williams did not provide any evidence of those convictions or explain how they related to her application for a protective order, the trial court informed her that such "information [wa]s not before the [c]ourt." Williams did not testify to any physical harm, bodily injury, assault, or sexual assault by Hollimon or any threat by Hollimon that placed her in fear of imminent physical harm, bodily injury, assault, or sexual assault. *See* TEX. FAM. CODE ANN. § 71.004(1), (3). Thus, there was no evidence to support a finding that Hollimon had committed family violence and was likely to commit family violence in the future.[4]

---

[4]    Because the protective order was granted under Texas Code of Criminal Procedure chapter 7B, and not Texas Family Code chapter 82, the trial court's erroneous

16

We sustain the portion of Hollimon's sole issue challenging the legal sufficiency of the evidence supporting the trial court's finding that he had committed family violence and was likely to commit family violence in the future. We overrule the remaining portions of Hollimon's sole issue.[5]

## Conclusion

We modify the trial court's final protective order to omit the finding that Hollimon "has committed family violence and is likely to commit family violence in the future." We affirm the order as modified.


Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

---

finding does not affect the validity of the protective order, but we modify the trial court's order to omit the challenged finding to prevent it from having any potential negative consequences in the future. *Cf. In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

[5] To the extent that Hollimon asserts, in the summary of the argument section of his brief, that the ten-year protective order was unconstitutional as applied to him, he did not object to the protective order on constitutional grounds in the trial court or identify that assertion as an issue on appeal. Thus, this argument has been waived. *See* TEX. R. APP. 33.1(a), 38.1(f); *Jacquot v. Coker*, No. 14-20-00123-CV, 2022 WL 1180138, at *9 (Tex. App.—Houston [14th Dist.] Apr. 21, 2022, no pet.) (mem. op.) ("Even constitutional claims . . . can be waived without a proper objection.").