

# NUMBER 13-18-00123-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**INTEG CORPORATION AND
GODFREY GARZA JR.,**             **Appellants,**

**v.**

**HIDALGO COUNTY DRAINAGE
DISTRICT NO. 1, ET AL.,**             **Appellees.**

---

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Rodriguez and Benavides[1]
Memorandum Opinion by Justice Benavides**

Integ Corporation, which was wholly owned by Godfrey Garza, Jr., was hired by

---

[1] The Honorable Nelda V. Rodriguez, former Justice of this Court, was a member of the panel at the time this case was orally argued but did not participate in this memorandum opinion because her term of office expired on December 31, 2018.

Hidalgo County Drainage District No. 1 (HCDD), to serve as HCDD's manager in 2000 and it held the position until 2014. In 2017, HCDD sued Integ and Garza based on events arising out of that relationship and also sued Valley Data Collection Specialists, Inc. (Valley Data), Annie Q. Garza, Godfrey Garza, III, and Jonathon Garza (the individual defendants). Integ and Garza counterclaimed. The trial court granted a plea to the jurisdiction filed by HCDD and dismissed the counterclaim. The trial court also granted summary judgment dismissing HCDD's claims.

By a single issue, Integ/Garza, appellants and cross-appellees, appeal from the grant of HCDD's plea to the jurisdiction. Cross-appellant and appellee HCDD appeals from the dismissal of its claims against Integ/Garza, Valley Data and the individual defendants for breach of fiduciary duty, fraud, breach of contract, civil conspiracy, unjust enrichment, and constructive trust.[2]

Because resolution of Integ/Garza's plea to the jurisdiction depends in part on whether any of HCDD's claims against Integ/Garza remain viable, we address HCDD's issues first. By four issues and multiple sub-issues, HCDD challenges the trial court's grant of the motions for no-evidence and traditional summary judgment against it and argues that the trial court abused its discretion by denying its motions to continue the summary judgment hearings and trial date. Cross-appellees Valley Data, and the individual defendants responded to HCDD's challenge to the trial court's grant of summary judgment but seek no affirmative relief. We reverse and remand in part and

_____

[2] Its first issue, HCDD argues that all of the interlocutory orders merged into a final judgment when HCDD dismissed its remaining claim on February 9, 2018. There is no dispute that the order on appeal is now a final judgment.

2

affirm in part.

## I. BACKGROUND

HCDD is a division of local government that is operated by the Hidalgo County Commissioners' Court, which sits as its Board of Directors. *See* TEX. WATER CODE ANN. §§ 49.001, 49.051, 49.054. Beginning in approximately 1995, HCDD hired Garza as an employee manager of HCDD, a position he held for four or five years. After that time, Garza planned to leave because he wanted to make more money in the private sector. Alternatively, he proposed to the Commissioners' Court that they hire Integ to become the manager and allow the company to take on outside work. The Commissioners' Court agreed and simultaneously accepted Garza's resignation and approved a management consulting agreement (MCA) with Integ on October 3, 2000. *See id.* § 49.057(a). Integ was paid a flat fee on a monthly basis. That fee increased annually and came to include a car and telephone allowance. In 2007, Garza approached the Commissioners' Court with the idea of increasing his work and pay to include construction management for a project arising from a bond issue of approximately $100,000,000 approved by the voters, the Phase II drainage project. In exchange for the extra work, Garza proposed that he be paid a fee of one and a half percent based upon "actual construction costs," excluding land acquisition involved in the project. After a discussion that included safeguards for HCDD finances, the Commissioners' Court approved the new contract for a three-year period.

Garza continued to maintain his office at HCDD, his name remained on HCDD's letterhead as District Manager, and Garza continued to use HCDD's email address as

3

before but Integ was not mentioned.   Integ's responsibilities for HCDD, as enumerated in the MCA, included: to "perform the services herein contemplated faithfully, diligently, to the best of Integ's ability, consistent with all applicable laws, and all applicable local, state and federal regulations," to "perform management and compliance of the programs as specified by local, state and federal regulations," to "establish and maintain necessary standards of performance to assure activities and projects of the District comply with plans, applicable laws and regulations," to "exercise discretion and judgment in matters not covered by this Agreement and/or policies of the District," and to "communicate with the District's attorney on matters in litigation or potential litigation except as otherwise directed by the Board of Directors."   Notably, the MCA was personal to Garza.   HCDD was entitled to terminate the MCA on the death of Garza or injury or illness that would be reasonably likely to lead to the inability of Integ to perform services for a period in excess of thirty days.   Three items were added to Integ's list of duties in 2007 to encompass the broadened MCA.

Integ employed only Garza and his wife Annie Garza who performed office work for Integ intermittently.   According to the terms of the MCA, Integ was an independent contractor, not an employee of HCDD.   The MCA obligated HCDD to purchase general liability and errors and omissions insurance to cover Integ.   Although the MCA permitted Integ to handle outside work, it included a conflict of interest provision that required Integ to advise the Board of the nature of Integ's outside work and required Integ to turn down work if a majority of the Board deemed it to be a conflict of interest and also required that any outside work "not impair the fulfillment of Integ's obligations under the [MCA]."

4

Garza has two sons, Godfrey Garza, III (Trey) and Jonathon Garza, who formed Valley Data in 2004. Although Valley Data did not employ any licensed surveyors or licensed engineers, Valley Data provided surveying, geotechnical, and field engineering work for engineering companies that were doing work on drainage projects. Beginning in approximately 2006, Valley Data began doing large amounts of work for Tedsi Infrastructure Group (Tedsi), a local engineering firm, as a subcontractor for HCDD projects. Over time, Valley Data performed the same kind of work for other engineering firms, including Dannenbaum Engineering, who also held prime contracts with HCDD. In 2012, Annie Garza acquired Valley Data. Although Valley Data was not paid by HCDD, Valley Data was paid by companies who were paid by HCDD.

Lora Briones became the chief financial officer of HCDD in 2003. She reported to Garza. Briones testified that the 2007 contract concerned her, especially since she was required to compute the construction management fee.

Briones also learned informally from a Dannenbaum employee in 2008 that Valley Data was subcontracted to Dannenbaum on a HCDD contract but she did not know the extent of the work that Valley Data was performing. In 2014, Briones came across documentation of payments to Valley Data on HCDD contracts. At that time, she brought the information to the attention of county judge, Ramon Garcia. She also took the information to the FBI and to the Texas Attorney General because she was concerned about the undisclosed conflict of interest.

Between 2007 and 2014, Integ and Valley Data were paid millions of dollars from HCDD tax dollars. In October 2014, HCDD hired the Lee Firm in Corpus Christi to

5

investigate whether it had claims against Integ/Garza. During the investigation, Michael Lee interviewed Briones, Ray Eufracio, and Steve Crain (HCDD's attorney). Lee gave a written report to the Commissioners in 2015. In his report, Lee discussed a project in which the federal Department of Homeland Security (DHS) planned to build a border wall on top of levees that were improved to protect Hidalgo County from flooding. Lee concluded that in February 2007 when the Commissioners' Court approved the MCA for construction management with Integ, it did not contemplate the federal wall/levee project which did not occur until later that year. As a result, according to Lee, there could have been no meeting of the minds that the federal project was part of the Phase II drainage project. The federal government put up $178 million for the DHS project. HCDD contributed an initial $28 million from the HCDD bond issue that was approved by the Commissioners' Court.[3] Later on, according to the Lee report, HCDD contributed another $30 million. Lee also concluded that "actual construction costs" in the MCA meant something less than "total construction costs" as defined by the General Accounting Standards Boards Statement 34 which includes land acquisition and all preliminary engineering work. From the context of the discussion between the parties at the February 2007 Commissioners' Court meeting and other research, Lee determined that the term "actual construction costs" meant "direct construction costs for labor, material, equipment, services, contractors overhead and profit, not including compensation to the architect, and engineer and consultants, the cost of land, right-of-way, or other costs." Lee noted that Crain disagreed and took the broader view that

_____

[3] The record does not include the dates on which the vote(s) to approve the monies from the bond issue to be added to levee project were made.

"actual construction costs" included everything except land acquisition costs. Crain also took the view that the 2007 to 2013 MCAs included construction management on the DHS project.

In 2017, HCDD filed suit against Integ, Garza, Valley Data and the individual defendants. HCDD's original petition alleged: breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract, civil conspiracy, unjust enrichment, and constructive trust. Integ/Garza filed a general denial, raised affirmative defenses of limitations, estoppel, ratification, unclean hands, waiver, laches, circuity of action doctrine, failure to exhaust administrative procedures, and brought a counterclaim for breach of contract for failure to carry insurance as required. Valley Data and the individual defendants filed a general denial to HCDD's claims and asserted the affirmative defenses of limitations and estoppel.

After two years of contentious discovery, Integ/Garza, Valley Data, and the other defendants filed their motions for summary judgment and HCDD filed its plea to the jurisdiction. HCDD filed its fourth amended petition on January 24, 2018, in which it first asserted civil claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO). *See* 18 U.S.C. § 1964(c). Ostensibly, as a result of the civil RICO claims, the individual defendants refused to appear for depositions that were scheduled for January 26, 2018. Thus, HCDD had not taken the depositions of the individual defendants at the time of the summary judgment hearing on January 31, 2018.

The trial court denied HCDD's motion to continue the summary judgment hearing and the trial date and granted all of the summary judgment motions and the plea to the

jurisdiction on February 5, 2018. HCDD nonsuited its civil RICO claims on February 5, 2018, and the judgment became final. Integ/Garza filed a notice of appeal from the grant of the plea to the jurisdiction and HCDD filed a notice of appeal from the grant of the motions for summary judgment.

## II. SUMMARY JUDGMENTS AGAINST HCDD

Integ/Garza, Valley Data, and the individual defendants filed no-evidence motions for summary judgment against HCDD seeking dismissal of all of the claims[4] against them on multiple grounds. Integ/Garza also filed a traditional motion for summary judgment on its affirmative defenses of collateral attack on judgments, laches, and lack of fiduciary relationship.

## A. Standard of Review and Applicable Law

We review the trial court's granting of a motion for summary judgment de novo. *Cantey Hanger, LLP v. Boyd*, 467 S.W.3d 477, 481 (Tex. 2015); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). By a no-evidence motion, the movant alleges that no evidence exists for one or more essential elements of a claim on which the respondent bears the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The trial court must grant the motion unless the respondent produces more than a scintilla of evidence for each of the challenged elements of the claim. *Hamilton*, 249 S.W.3d at 426; *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). Evidence is more than a scintilla where it "would enable reasonable and fair-minded jurors to differ in their

---

[4] The motions for summary judgment did not attack HCDD's RICO claims that were added after the motions for summary judgments were filed.

8

conclusions." *Hamilton*, 249 S.W.3d at 426; *see King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

When reviewing a traditional motion for summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Cantey Hanger, LLP*, 467 S.W.3d at 481. The movant bears the burden of proof, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Nalle Plastics Fam. Ltd. P'ship v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 200 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied). In reviewing the grant of summary judgment under either traditional or no-evidence, we must credit evidence favoring the non-movant, indulging every reasonable inference and resolving all doubts in his or her favor. *Cantey Hanger, LLP*, 467 S.W.3d at 481; *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995).

When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Carr v. Brashear*, 776 S.W.2d 567, 569 (Tex. 1989); *Garcia v. Tex. Cable Partners, L.P.*, 114 S.W.3d 561, 567 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.).

## B.  No-Evidence Motions

Integ, Valley Data, and the individual defendants moved for no-evidence summary judgment on the following grounds: (1) breach of fiduciary duty, (2) fraud, (3) negligent

misrepresentation, [5] (4) breach of contract, and (5) civil conspiracy. HCDD responded with evidence and filed a supplemental response.[6] By its second issue, HCDD globally challenges the trial court's grant of Garza and Integ's motions for no-evidence summary judgment. By its fourth issue, HCDD globally challenges the trial court's grant of Valley Data and the individual defendants' motions for no-evidence summary judgment.

### 1. Fiduciary Duty

HCDD alleged that Integ/Garza breached their fiduciary duty to HCDD. Integ/Garza argue that because they were an independent contractor for HCDD, as a matter of law, there could be no fiduciary relationship between them and HCDD.

The MCA from 2007 through 2013 recites that Integ "shall perform the duties of the manager of [HCDD]" and lists eighteen specific functions. The MCA permitted Integ "to perform consulting and other services for other firms, individuals or local governments when such work does not impair the fulfillment of Integ's obligations under this Agreement." The MCA further provides that "Integ, at all times will act as an independent contractor managing and supervising [HCDD]'s operations and will not act or hold itself out to third parties as an employee or agent of [HCDD]."

### a. Elements of Fiduciary Duty

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the

---

[5] HCDD dropped this claim in its fourth amended petition.
[6] Integ/Garza objected to the supplemental response and moved to strike HCDD's summary judgment evidence. The trial court orally denied the motion to strike and considered HCDD's supplemental response and evidence. On February 9, 2018, the trial court signed an order memorializing its ruling.

defendant's breach." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.— Houston [14th Dist.] 2008, pet. denied); *see also Wells Fargo Bank, N.A. v. Crocker*, No. 13-07-00732-CV, 2009 WL 5135176, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2009, pet. denied) (mem. op.).

Texas law recognizes two types of fiduciary relationships. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (per curiam); *Salas v. Total Air Servs, LLC*, 550 S.W.3d 683, 689 (Tex. App.—El Paso 2018, no pet.) "The first is a formal fiduciary relationship, which arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)). "The second is an informal fiduciary relationship, which may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" *Id.*; *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Although "a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* "[W]hile the existence of an informal fiduciary relationship 'is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law.'" *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 594 (Tex. 1992). A fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty. *Willis v. Maverick*, 760 S.W.2d 642, 645 & n.2 (Tex.

11

1988).

### b. Evidence of Fiduciary Duty

Garza was employed by HCDD for four years as its manager before HCDD hired Integ pursuant to the MCA. The MCA stated that it "recognize[d] the benefits of contracting with a party who will employ the former manager of [HCDD]." The evidence conclusively establishes that Garza had a longstanding relationship with HCDD before the parties executed the MCA. Garza's previous relationship with HCDD was that of employee/employer, which is "a species of the formal principal–agent relationship." *Salas*, 550 S.W.3d at 690. "An agent generally has a fiduciary duty to act for the benefit of his principal in all matters connected with the agency." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002). An "agent" is one who is authorized by another to transact business or manage some affair for him. *See Neeley v. Intercity Mgmt. Corp.*, 732 S.W.2d 644, 646 (Tex. App.—Corpus Christi–Edinburg 1987, no writ); *Jorgensen v. Stuart Place Water Supply Corp.*, 676 S.W.2d 191, 194 (Tex. App.—Corpus Christi–Edinburg 1984, no writ). The agency relationship does not depend upon express appointment or agreement by the principal; but may be implied from the conduct of the parties under the circumstances. *See Gibson v. Bostick Roofing & Sheet Metal Co.*, 148 S.W.3d 482, 492 (Tex. App.—El Paso 2004, no pet.); *Jorgensen*, 676 S.W.2d at 194.

During Integ's tenure as manager of HCDD, Garza's name was listed on HCDD's letterhead as District Manager; Integ was not mentioned. Garza's emails use HCDD's system and are signed the same way. Garza continued to interact with the Commissioners' Court in the same way that he had before he left HCDD's employ. There

is more than a scintilla of evidence that Garza held himself out as HCDD's agent based upon the manner in which HCDD allowed the use of its letterhead and email. There is also more than a scintilla of evidence of a relationship of trust between Garza and HCDD that preexisted Integ/Garza's and HCDD's contractual relationship.

Although the MCA specified that the relationship was that of an independent contractor, the MCA does not conclusively establish that no fiduciary relationship was formed. An independent contractor may serve as a fiduciary. *See Abetter Trucking Co.*, 113 S.W.3d at 507–08. When a contract specifying an independent contractor relationship exists and there is also evidence that the written contract has been modified by a subsequent implied agreement, such as Garza's apparent holding himself out as an agent of HCDD, there is a fact issue on the existence of a fiduciary relationship that precludes summary judgment. *See Weidner v. Sanchez*, 14 S.W.3d 353, 374 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see also Perez v. Greater Houston Transp. Co.,* No. 01-17-00689-CV, 2019 WL 3819517, at *4 (Tex. App.—Houston [1st Dist.] Aug. 15, 2019, pet. filed) (mem. op.).

There was more than a scintilla of evidence to support a finding that Integ breached a fiduciary relationship by being less than candid with HCDD. A prime example is Garza's instruction that Integ's invoices be placed on the consent agenda and not sent through the auditor, thus avoiding any scrutiny that Integ construction management fees for preliminary engineering work rather than "actual construction costs" or against DHS projects. *See Willis*, 760 S.W.2d at 645 & n.2 (holding that a fiduciary owes a duty of full and fair disclosure). There was competing expert opinion as to whether the DHS project

13

was part of the Phase II Drainage project and thereby part of the MCA on which Integ was authorized to charge construction management fees.

We conclude HCDD produced more than a scintilla of evidence on every element of breach of fiduciary duty. Accordingly, the trial court erred by granting the motions for no-evidence summary judgment on breach of fiduciary duty.

## 2. Fraud

HCDD argues that when Garza made his pitch to HCDD to pay him for construction management of the Phase II drainage project that he intentionally misrepresented the following material facts: (1) that his fee would be based on actual construction costs, (2) there would be checks and balances in processing the amounts through the use of an outside auditor, and (3) Garza would be paid only for that which was actually built. HCDD allegedly relied on those misrepresentations by agreeing to the 2007 MCA including construction management fees.

Integ/Garza, Valley Data, and the individual defendants moved for no-evidence summary judgment on HCDD's fraud claim. The record includes a transcript of the Commissioners' Court meeting on February 6, 2007 in which the Commissioners' Court approved the 2007 MCA. Commissioner Garza (unrelated to Integ/Garza) commented that he was looking for checks and balances on the financials so that someone other than Garza would be involved. Integ/Garza represented that Briones, the HCDD chief financial officer, would be handling the financial end on behalf of the district. Integ/Garza then added,

> One of the things [HCDD is] looking at, that's coming before the board is hiring an independent auditor, to be looking at all the bond issues . . . to

14

provide the transparency, per se, of the district itself, not monitoring itself, even though we have an independent auditor, is to hiring an auditing company that does the overview of all the bond issue money that comes in place. That is the checks and balances.

Commissioner Garza responded, "By hiring an outside auditing firm."

Garza estimated that his eventual payout over a ten year period would be $150,000. He represented that he would be paid only on what was actually built while Integ was HCDD's manager. The Board adopted the 2007 MCA with the percentage for construction management after that discussion.

### a. Elements of Fraud

"A common-law fraud claim requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (internal quotations omitted) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

### b. Evidence of Fraud

One of the misrepresentations HCDD complained of was Garza's statements to the Commissioners' that all of the construction management payments would go through the auditors, perhaps even bond money auditors. Yet after the MCA was executed, Garza specifically directed that all of Integ's payments be placed on the consent agenda and never go to the auditors. Because Garza supervised the district employees, he controlled the preparation of the Commissioners' Court agenda the flow of paperwork. His instructions regarding his first and all subsequent payments not going through the

15

auditors is more than a scintilla of evidence that his statement to the Commissioners' Court was false when it was made and was designed to be acted upon. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

In addition, HCDD challenges Integ's right to recover construction management fees on engineering work and contends that Garza fraudulently misrepresented the contract to HCDD. Integ's first invoice for construction management fees submitted in April 2008 for over $100,000, included fees on preliminary engineering work for projects that were not yet built including:

(1) preliminary engineering services, hydrology and hydraulic analysis, final design, and preliminary engineering for the Raymondville Drain project;

(2) construction and inspection of sluice gates at the Mission inlet;

(3) preliminary engineering and right of way for Monte Christo Outfall;

(4) preliminary engineering and topographic, right of way, preliminary engineering, control BMs for La Villa Drain;

(5) engineering and surveying, Geotech services, Penitas drain PO for Penitas Drain Basin;

(6) preliminary engineering, field surveying, preliminary engineering & schematics, topographic data & maps, funding liaison, additional preliminary engineering, field surveying, cultural resources, special services, on call services, Penitas common levee, Penitas to common levee for the Levee system;

(7) geotechnical engineering, preliminary engineering and final design, channel final design, channel final design for Jackson Drain;

(8) preliminary engineering and field survey, PSE, preliminary engineering for the Westfall Outfall;

(9) geotech drilling/material testing/boring location, construction material testing and engineering, and construction costs for Alamo Drain; and

16

(10) engineering and construction costs for Pharr McAllen South Drain. According to HCDD, the invoice itself demonstrated both the fraudulent nature of the misrepresentation and also damages. HCDD's reliance on Garza's representations is demonstrated by the passage of the 2007 MCA that included the construction management fee.

Furthermore, the Raymondville Drain, Monte Christo, La Villa, Weslaco, and McAllen Pharr South Drain projects were not completed by the time Garza left HCDD in late 2014 or early 2015, and therefore Integ should not have been paid for them under the terms of the MCA. Those payments also constitute evidence of damages.

Based upon this summary judgment evidence, HCDD produced more than a scintilla of evidence on each element of fraud. Accordingly, the trial court erred when it granted no-evidence summary judgment on this claim.

### 3. Breach of Contract

HCDD argued that Integ breached the MCA by: (1) receiving construction management fees on the DHS project which was not part of the Phase II drainage system projects, (2) not performing construction management, and (3) failing to disclose conflicts of interest inherent in his relationship with Valley Data. Breach of contract requires proof of four elements: (1) formation of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) the plaintiff sustained damages as a result of the breach. *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018).

Integ/Garza, Valley Data, and the individual defendants moved for no-evidence summary judgment on breach of contract. The parties agree that there were a series of

17

contracts and HCDD paid Integ/Garza for years pursuant to the contracts. The challenged elements are whether Integ/Garza breached the MCA and whether their breach caused damages.

### a.  Master Drainage System Phase II

Before HCDD and Integ/Garza entered into the MCA in 2007 for construction management, Garza described the additional work to the Board as:

> large development within the district, which is the Master Drainage System, Phase II.  At this time the voters have allocated about $100 million dollars We have a 15-20 year program out there which might total 4[00]-500 million dollars.  Because of the growth we're having we have more coordination going on with the International Boundary Commission, the Corp[s] of Engineers . . . Along with the construction management of these projects that are coming into play.

The MCA approved by the Board on February 6, 2007 stated:

> as compensation for construction management of the Hidalgo County Master Drainage System Phase II, District shall pay Integ on a semi-annual basis commencing August 1, 2007 one and a half percent of the actual construction costs excluding land acquisition costs of the Hidalgo County Master Drainage System Phase II as calculated by the Financial Officer of the District.

The MCA was reapproved and extended through 2013.  Lee's investigation report concluded that the 2007 MCA did not and could not have included the DHS project because it was not contemplated in February 2007 at the time that the Commissioners voted on the 2007 MCA.   The Phase II drainage project included a portion for levee work that became part of the DHS project.  The DHS project was funded in large part by federal money, not the 2006 bond issue.

Among the invoices Integ submitted to HCDD were those for:

$226,976.17 in May 2009 for Fund 120 DHS Segments (under the HCDD

18

Master Drainage System Contract, according to the Integ invoice);

$244,858.67 in January 2010 for Fund 120 DHS Segments Services (under the HCDD Master Drainage System Contract according to the Integ invoice);

$111,921.43 in June 2010 for work on the DHS project.

Briones testified that DHS withheld over two million dollars in funds from Hidalgo County based upon payments HCDD made to Garza/Integ on the DHS project. Although Crain gave an opinion that the DHS project was part of the the Phase II master drainage system project, Lee concluded that the 2007 MCA did not include the DHS project. In light of competing expert opinions, there are fact questions regarding whether Integ/Garza breached the MCA and whether HCDD sustained damages based on Integ's billing construction management fees against the DHS project.

### b. MCA Conflict of Interest

The MCA also included a conflict of interest provision. The provision stated that before Integ/Garza received payment or entered into a contract or business relationship with another entity:

> who was financially interested in a contract with the District or who is a director or employee of any such individual or entity, *Integ shall disclose* the proposed contract or *business relationship or payment to the [Commissioners' Court]*. Integ's *disclosure shall be entered into the minutes of a meeting of the District.* Integ agrees to abide by the majority vote of the [Commissioners' Court] as to whether the [Commissioners' Court] determines a conflict of interest may exist because of the proposed relationship. Should the [Commissioners' Court] determine a conflict of interest may exist, Integ agrees not to provide service to or receive payment from such individual or entity. The [Commissioners' Court] may, upon a majority vote, terminate this Agreement upon three (3) days' notice to Integ upon finding that Integ has violated the terms of this paragraph.

(Emphasis added).

19

The MCA also required Integ to "perform management and compliance of the programs of [HCDD] as specified by local state and federal regulations." The Texas Local Government Code has provisions regarding conflicts of interests that, although not specifically referenced by the MCA, inform Integ/Garza's conduct. *See* TEX. LOC. GOV'T CODE ANN. §§ 171.001,[7] 171.002,[8] 171.003, 171.004.[9]

In addition, HCDD periodically sent a questionnaire regarding conflicts of interests to its employees. The 2013 questionnaire asked whether "you or any related party of

---

[7] Section 171.001 defines a local public official to include a member of the governing body or other officer of any district or local governmental entity "who exercises responsibilities beyond those that are advisory in nature." TEX. LOCAL GOV'T CODE ANN. § 171.001.

[8] Section 171.0002 defines a "substantial interest" in a business both in terms of money or in terms of relationship:

> (a) For purposes of this chapter, a person has a substantial interest in a business entity if:
>
>> (1) the person owns 10 percent or more of the voting stock or shares of the business entity or owns either 10 percent or more or $15,000 or more of the fair market value of the business entity  . . .
>
> (c) *A local public official is considered to have a substantial interest under this section if a person related to the official in the first degree by consanguinity or affinity*, as determined under Chapter 573, Government Code, has a substantial interest under this section.

*Id.* § 171.002 (emphasis added).

[9] Section 171.004 states when a person with a substantial business interest shall disclose that interest:

> (a) If a local public official has a substantial interest in a business entity or in real property, the official *shall file, before a vote or decision on any matter involving the business entity* or the real property, *an affidavit stating the nature and extent of the interest and shall abstain from further participation in the matter if*:
>
>> (1) in the case of a substantial interest in a business entity the action on the matter *will have a special economic effect on the business entity* that is distinguishable from the effect on the public; . . .
>
> (b) The affidavit must be filed with the official record keeper of the governmental entity.

*Id.* § 171.004 (emphasis added).

20

yours had any material interest, direct or indirect, in any of the following transactions or pending transactions since January 1, 2012 to which [HCDD] was or is to be a party?" The listed transactions included: sales, purchase, exchange, or leasing of property; receiving or furnishing of goods, services, equipment or facilities, receiving commissions or compensation from vendors of the District, or other transactions. Garza answered "no" for all years. In 2014, Garza responded positively to a question about a receivable from HCDD by stating "pending final closure of contract if required." He signed the forms stating that his answers "were correctly stated to the best of his knowledge and belief." Most years the questionnaires were sent by HCDD's independent outside auditors.

Valley Data entered into a subcontract with Dannenbaum Engineering which had contracts with HCDD. One contract was dated February 12, 2007 and signed by Trey Garza for Valley Data and Louis Jones, Jr., President of Dannenbaum Engineering. Article 14 of that contract limited Dannenbaum's ability to subcontract or assign work under the contract without prior consent of HCDD. Attached to the contract as an exhibit was a work authorization signed by Jones and Garza as District Manager for HCDD. A second contract between Dannenbaum and Valley Data dated in June 2007 similarly included a work authorization exhibit signed by Garza on behalf of HCDD. The work authorizations Garza signed were for amounts later paid by Dannenbaum to Valley Data. Between 2006 and 2008, Dannenbaum paid Valley Data $1,494,588.07 for surveying, topographic, and right of way work done on the levee improvement project.

According to Garza's deposition testimony, Valley Data borrowed at least $75,000 interest-free without a written loan agreement or documentation from Integ for capital.

Valley Data also rented space from Garza or Integ, but only occasionally paid rent and there was no written lease. Because Valley Data owed and paid money to Integ/Garza, Integ received monies from a company that was financially interested in a contract with the District. Although Garza admitted that he informally told Commissioners that his sons owned Valley Data, he did not formally advise the Commissioners' Court. Garza testified that he did not believe the MCA required him to notify the Commissioners' Court of his relationship with Valley Data, even after his wife assumed ownership of Valley Data in 2012.

According to Chapter 573 of the Government Code, Garza's wife and sons are within the first degree of affinity and consanguinity to him and local government code § 171.002, defines their interest in Valley Data as "substantial." *See* TEX. GOV'T CODE ANN. §§ 573.023, 573.024; TEX. LOC. GOV'T CODE ANN. § 171.002. Because of Texas marital property laws, Garza himself had a substantial ownership interest in Valley Data in 2012. *See* TEX. FAM. CODE ANN. § 3.002 ("Community property consists of the property other than separate property acquired by either spouse during the marriage.").

HCDD provided more than a scintilla of evidence that Integ/Garza either violated the conflict of interest provision of the MCA or lied on his conflict of interest questionnaires which constituted a breach of the MCA. The Commissioners' Court could have terminated the MCA on three days' notice as provided by its terms if they determined that Integ/Garza had a conflict of interest. There is an issue of material fact was to whether HCDD was damaged by unwittingly retaining a manager who had an undisclosed conflict of interest.

22

### c. Integ/Garza Did Not Have the Capacity to Perform

HCDD further claimed that Integ breached the MCA by not performing construction management work it was paid to perform because other entities performed it. When he testified, Garza was unable to produce any documentation that he actually visited any construction sites or reviewed any documentation.

The HCDD contract with Dannenbaum provided that it would be paid approximately four percent of its contract total for professional engineering and construction management on the DHS project which eliminated the need for Integ to perform construction management. According to Briones' testimony, Dannenbaum successfully litigated against HCDD for payment for construction management funds that had been paid to Integ that it claimed should have been paid to Dannenbaum.

In addition to its other theories, HCDD produced evidence that Integ, which was just Garza and his wife, was spread too thin to perform construction management. From 2009 to 2012, Integ was also the director for the Hidalgo County Regional Mobility Authority (RMA) and managed a project for it. During that time Integ was paid approximately $600,000 by RMA.

### d. Conclusion

HCDD has provided more than a scintilla of evidence on each element of breach of contract on multiple theories. No-evidence summary judgment should not have been granted.

### 4. Civil Conspiracy

HCDD alleges that Garza recommended that HCDD enter into prime contracts with

Dannenbaum and others, that Garza represented that the contracts were fair and reasonable and in HCDD's best interest. According to HCDD, Integ/Garza, Valley Data, and the individual defendants "conspired to make the kickbacks happen" when HCDD money was funneled to Garza through the construction management fee he received, including monies paid on Valley Data subcontracts.

Civil conspiracy is a theory of vicarious liability that requires some underlying wrong. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019). It requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *See Triplex Commun'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). A specific intent to agree to accomplish the unlawful purpose or to accomplish the lawful purpose by unlawful means is also required. *Id.* "For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Id.* Civil conspiracy depends entirely on the injury caused by the underlying tort; the injury is the damage from the underlying wrong, not the conspiracy itself. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968). "Conspiracy may be established by circumstantial evidence." *Lesikar v. Rappoport*, 33 S.W.3d 282, 302 (Tex. App.—Texarkana pet. denied). "A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do." *Id.* (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) (quoting *Whitmore v. Allen*, 33 Tex. 355 (1870))).

24

Valley Data first started doing work for Tedsi, a prime contractor in 2006, before Integ obtained the construction management fee modification to the MCA. It earned $247,361 on HCDD projects that year. In later years, Valley Data worked for several contractors including Tedsi, L&G Consulting Engineers, LeFevre Management and Consulting, LLC, and Dannenbaum. Even without a conspiracy, Garza benefitted from his post-2007 MCA that funneled money to any construction project from which he could collect a management fee.

HCDD provides some evidence that it claims demonstrates concert of action between November 2007 and May 2008 when Dannenbaum hired Valley Data to perform over $1.4 million of work and failed to disclose Valley Data's identity as a subcontractor in violation of Dannenbaum's contract with HCDD. Garza submitted work authorizations to HCDD for the same amount of each individual contract to the Commissioners' Court for approval on dates near the time of each Valley Data contract with Dannenbaum. That evidence does not necessarily speak to concert of action between Integ/Garza and Valley Data.

Although Valley Data clearly benefitted from its familial relationship with Garza and from his failure to properly disclose the conflict of interest, HCDD did not allege a meeting of the minds between Valley Data and Integ/Garza, nor did HCDD provide summary judgment evidence of a meeting of the minds or shared intent. HCDD asks that we consider that the familial relationship implied shared intent or a meeting of the minds. *See Nix v.* Born, 870 S.W.2d 635, 642 (Tex. App.—El Paso 1994, no pet.) (rejecting notion that spousal relationship makes one the agent of the other without evidence of an

25

agreement between them to engage in civil conspiracy). However, Rule 166a(i) requires HCDD to point to evidence. *Compare Anderton* v. *Cawley*, 378 S.W.3d 38, 61–62 (Tex. App.—Dallas 2012, no pet.) (reversing no-evidence summary judgment on civil conspiracy element of evidence of meeting of the minds) *with Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 164–65 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (affirming no evidence summary judgment on grounds of no meeting of the minds).

Because HCDD did not point to evidence on the elements of civil conspiracy other than a benefit to Valley Data from its relationship to Garza, the trial court properly granted no-evidence summary judgment as to HCDD's claim of civil conspiracy.

### 5. Summary

We sustain HCDD's first and fourth issues in part and reverse the trial court's grant of no-evidence summary judgment as to HCDD's claims for breach of fiduciary duty, fraud, and breach of contract. We overrule HCDD's first and fourth issues in part as to civil conspiracy.

### C. Integ/Garza's Traditional Motion for Summary Judgment

By its third issue and multiple sub issues, HCDD challenges the trial court's grant of Integ/Garza's traditional motion for summary judgment on the grounds that HCDD's claims are barred by: (1) collateral attack, (2) laches, (3) no fiduciary duty, (4) lack of a civil conspiracy, and (5) because unjust enrichment and constructive trust are not proper causes of action. For a defendant to prevail on a traditional motion for summary judgment, it must either disprove at least one element of each of the plaintiff's claims as a matter of law or conclusively establish all elements of an affirmative defense to the

26

claims. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996); TEX. R. CIV. P. 166a(c). The trial court did not specify the grounds on which it granted the motion. Because we have already decided that no evidence supports HCDD's civil conspiracy claim, we need not address it again.

### 1. Collateral Attack Doctrine

Integ/Garza contend that the determination of the Commissioners' Court to make payment under the various contracts is a final judgment that may not be collaterally attacked in this litigation. [10] HCDD argues that because the trial court denied Integ/Garza's plea to the jurisdiction on this issue that the trial court believed that this argument did not deprive the trial court of jurisdiction. Because the trial court did not specify the grounds on which it granted summary judgment, we must determine whether summary judgment was proper on any ground. *See Carr*, 776 S.W.2d at 569.

In support of their motion for summary judgment, Integ/Garza cite *Yoakum County v. Gaines County*, 163 S.W.2d 393, 396 (Tex. 1942), which stated:

> Our courts have repeatedly held that the judgments of commissioners' courts, in all matters over which they are given jurisdiction, are entitled to the same consideration as those of other courts provided for by the Constitution; and that such judgments are not subject to collateral attack, and are reviewable only upon appeal or in a direct action for that purpose, in the absence of a showing of gross abuse of discretion, or of fraud or collusion or lack of jurisdiction.

*Id.* *Yoakum County* involved a boundary dispute settled by the Commissioners' Courts

---

[10] A collateral attack on a judgment, as opposed to a direct attack, does not attempt to secure a corrected judgment; rather it is an attempt to avoid the effect of a judgment "in a proceeding not instituted for the purpose of correcting, modifying, or vacating the judgment, but in order to obtain some specific relief which the judgment currently stands as a bar against." *Browning v. Prostok*, 165 S.W.3d 336, 346 (Tex. 2005).

27

of the involved counties that was challenged in a separate suit. *Id.* Integ/Garza also cited *Ector County v. Stringer*, 843 S.W.2d 477 (Tex. 1992), in which constables brought suit to require county commissioners to pay a specific salary. The district court held it did not have the power to set the salary; only the Commissioners' Court had that authority. *Id.* at 479. None of the cases supplied by Garza/Integ provide a true analog to the case before us. The closest case is *Jeff Davis County v. Davis*, 192 S.W. 291 (Tex. App.—El Paso 1917, writ ref'd), in which the county sued the sheriff after paying him sums to which he was not entitled. The monies paid fell into two categories: sums that the county was simply not liable for under any circumstance and should not have paid, and other sums that the sheriff paid to hire jailors as needed for which repayment was proper. *Id.* at 293. After paying the sheriff, the county learned that the sheriff never hired jailors and his claim was false and fraudulent. *Id.* In considering whether the county could sue to recover the funds, the El Paso court concluded:

> This authority of the commissioners' court is exclusive, and is subject only to the appellate jurisdiction of the district court under the provisions of section 8 of article 5 of the Constitution, which confers upon the district court appellate jurisdiction and general supervisory control over the county commissioners' court. Under this provision of the statute it is clear that the commissioners' court had jurisdiction and authority to settle all accounts against the county presented by the sheriff for guard hire and direct their payment or reject the same as the facts might warrant. In case of claims of any nature against a county, where it has jurisdiction and the authority to settle same and direct their payment, its action in so doing is conclusive, and cannot be reviewed except by the district court under its appellate jurisdiction. The district court has no authority to review and set aside the action of the commissioners' court with respect to such matters in a collateral proceeding.

*Id.* at 295. The El Paso Court of Appeals refused to allow the county to recoup its loss for payment for the jailors even though the sheriff had defrauded the Commissioners'

Court because to do so would be a collateral attack on the Commissioners' Court's judgment of payment. *Id.* at 297.

Under our current statutes, a Commissioners' Court is authorized to expend funds, but not without the approval of the county auditor, whose approval may not be arbitrarily withheld. *See* TEX. LOC. GOV'T CODE ANN. §§ 113.064, 115.021; *Crider v Cox*, 960 S.W.2d 703, 706 (Tex. App.—Tyler 1997, writ denied) (discussing legislative scheme under which the auditor's prior approval is a condition precedent for Commissioners' Court consideration); *Smith v. McCoy,* 533 S.W.2d 457, 459 (Tex. App.—Dallas 1976, writ dism'd). In *Crider*, the court of appeals held that the Commissioners' Court approval was void in the absence of auditor's prior approval. *See Crider*, 960 S.W.2d at 706.

HCDD admits the validity of the contract and that the payments were authorized by the Commissioners' Court but alleges breach of fiduciary duty, breach of contract, and fraud by Garza. Unlike in the case of *Jeff Davis County*, Garza had a contract that purported to entitle him to the funds he received. *See* 192 S.W. at 295. However, Briones testified that Garza instructed that none of Integ's invoices were to be submitted to the county auditor but were instead to be placed on the Commissioners' consent agenda for regular payments that were considered en masse. Garza's circumvention of auditor approval was not authorized by the MCA, nor was it otherwise approved by the Commissioner's Court.

Additionally, an allegation of extrinsic fraud does not constitute a collateral attack. *See State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993). "Extrinsic fraud" in the bill of review context is fraud that denied a party the opportunity to fully litigate all the rights or

defenses she was entitled to assert. *King Ranch*, 118 S.W.3d at 752; *Tice v. City of Pasadena*, 767 S.W.2d 700, 702 (Tex. 1989) (orig. proceeding). Extrinsic fraud generally includes wrongful conduct occurring outside of the adversarial proceedings. *Browning v. Prostok*, 165 S.W.3d 336, 347 (Tex. 2005). In this case, there were no adversarial or contested proceedings and payments of Garza/Integ's invoices were authorized on the consent agenda outside of the legislatively mandated proceedings and outside the proceedings contemplated by the commissioners at the time they entered into the MCA. *See Browning*, 165 S.W.3d at 346[11]; *Montgomery v. Kelly*, 669 S.W.2d 309, 314 (Tex. 1984) ("The controlling question is always whether the alleged fraud prevented the party from knowing about and presenting his legal rights at trial."). Based upon Briones's testimony that Garza actively concealed the invoices from the auditors and presented them only through the consent agenda for payment, there is a question of material fact as to whether Garza engaged in extrinsic fraud.

To the extent that that the trial court granted Integ/Garza's traditional motion for summary judgment on this ground, the trial court erred.

### 2. Laches

To establish the affirmative defense of laches, Integ/Garza must show that HCDD unreasonably delayed asserting its legal or equitable rights and that Integ/Garza had a

---

[11] On the other hand,

> [I]ntrinsic fraud [includes] fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed. It is particularly well-established that the alleged perjury of a witness on a contested issue, which the opposing party had the opportunity to refute, is intrinsic fraud.

*Montgomery v. Kelly*, 669 S.W.2d 309, 314 (Tex. 1984) (internal citations omitted).

good faith change of position to its detriment because of this delay. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989). "When a defendant moves for summary judgment based on an affirmative defense . . . the defendant, as movant, bears the burden of proving each essential element of that defense." *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012) (quoting *Ryland Grp, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam)).

Integ/Garza argue that they relied on the District's approval of their invoices and that approval is conclusive due to § 49.235 of the water code,[12] however, they do not assert a change in position. *See* TEX. WATER CODE ANN. § 49.235. HCDD contends that Integ/Garza hid the payments by placing them on the consent agenda and avoiding the auditors by putting pressure on Garza's subordinates at HCDD. Indeed, Briones testified that she went to the County Treasurer who thought the county had to pay the invoices. Briones went to the FBI in approximately 2008 when she did not get local relief. The Commissioners' Court apparently did not become aware of a potential problem until sometime in 2013 or 2014. There is a fact issue as to when the Board became aware that at least some of the payments were on the DHS project and on projects that had not yet been built.

---

[12] That provision of the water code provides in part:

> (a) A governmental act or proceeding of a district is conclusively presumed, as of the date it occurred, valid and to have occurred in accordance with all applicable statutes and rules if:
>> (1) the third anniversary of the effective date of the act or proceeding has expired; and
>> (2) a lawsuit to annul or invalidate the act or proceeding has not been filed on or before that third anniversary.

TEX. WATER CODE ANN. § 49.235(a).

Assuming, but not deciding that laches applies to HCDD as a governmental entity, there is a fact question as to when HCDD knew that it had a cause of action against Integ/Garza. Accordingly, the trial court erred if it granted summary judgment based upon Garza/Integ's affirmative defense of laches.

### 3. Breach of Fiduciary Duty

Integ/Garza point to the MCAs that were approved by HCDD as proof that they were an independent contractor who could owe no fiduciary duty to HCDD. "Where the underlying facts are undisputed, determination of the existence, and breach, of fiduciary duties are questions of law, exclusively within the province of the court." *Meyer*, 167 S.W.3d at 330 (quoting *Nat'l Med. Enters. v. Godbey*, 924 S.W.2d 123, 147 (Tex. 1996)). However, in this case, the facts are far from undisputed. For all of the reasons set out in Part II(B)(1), there is a fact question as to whether Garza had a confidential or fiduciary relationship with HCDD.

As a result, the trial court abused its discretion by granting summary judgment in favor of Integ/Garza on this claim.

### 4. Unjust Enrichment

HCDD alleges that Integ took undue advantage regarding the construction management contract and should not be allowed to reap the benefit of its undue advantage. Integ asserts that this cause of action is equitable and must give way to the contract between the parties. *See Burlington N. R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998). "The unjust enrichment doctrine

32

applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties." *Id.* However, the doctrine "does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.* We agree that the MCA precludes the application of the doctrine of unjust enrichment. *Id.* The trial court properly granted summary judgment on this issue.

### 5. Constructive Trust

HCDD seeks imposition of a constructive trust. Integ/Garza argue that a constructive trust is not a cause of action on which HCDD may recover. A constructive trust may be imposed upon: (1) proof of breach of a fiduciary relationship or fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015); *see also Martinez v. Martinez*, No. 10-15-00410-CV, 2017 WL 3686850, at *4 (Tex. App.—Waco Aug. 23, 2017, pet. denied) (mem. op.). This Court has determined that a fact question exists on the issues of breach of fiduciary duty and fraud as to Integ/Garza such that the remedy of constructive trust may be applicable, however, HCDD has not pointed to an identifiable res in its summary judgment evidence. As a result, the trial court properly granted summary judgment on this issue.

### 6. Summary

We sustain HCDD's third issue in part as to breach of fiduciary duty and Integ/Garza's affirmative defenses of collateral attack and laches.

33

### III.    HCDD's Plea to the Jurisdiction

Integ/Garza counterclaimed against HCDD for breach of contract for $84,000 owed under the MCA, for damages due to a lis pendens HCDD filed against property owned by Integ/Garza, and for damages caused by HCDD's failure to procure insurance required under the MCAs.   HCDD filed a plea to the jurisdiction that the trial court granted.   By their sole issue, Integ/Garza challenge the trial court's grant of HCDD's plea to the jurisdiction.

### A.    Standard of Review and Applicable Law

A plea to the jurisdiction is a dilatory plea by which a party challenges the court's authority to determine the subject matter of the action.   *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Hidalgo County v. Dyer*, 358 S.W.3d 698, 703 (Tex. App.—Corpus Christi–Edinburg 2011, no pet.).   The initial burden is on the plaintiff to allege facts affirmatively demonstrating that the trial court has subject matter jurisdiction.   *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001); *City of El Paso v. Mazie's, L.P.*, 408 S.W.3d 13, 18 (Tex. App.—El Paso 2012, pet. denied); *Vantage Sys. Design, Inc. v. Raymondville Indep. Sch. Dist.*, 290 S.W.3d 312, 315 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied).   Whether a party has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law which is subject to de novo review.   *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).   When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the

34

jurisdictional issues raised, even when the evidence implicates the merits of the cause of action. *Id.* Likewise, whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law subject to de novo review. *Id.*

In their live petition, Integ/Garza asserted that the trial court had jurisdiction under § 271.152 which waives local governmental entities' immunity from suit for certain breach of contract claims. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). The statute provides that:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE ANN. § 271.152. The Texas Supreme Court has held that § 271.152, when applicable, waives a governmental entity's immunity from suit for breach of written contract. *See Williams*, 353 S.W.3d at 134; *Vantage Sys. Design, Inc.*, 290 S.W.3d at 315. The plaintiff must establish three elements for § 271.152's waiver of immunity to apply: (1) the party against whom the waiver is asserted must be a "local governmental entity" as defined by § 271.151(3); (2) the entity must be authorized by statute or the Constitution to enter into contracts; and (3) the entity must in fact have entered into a contract that is "subject to this subchapter" as defined by §§ 271.151 and 271.152 of the Texas Local Government Code. *See Williams*, 353 S.W.3d at 134–35; *Vantage Sys. Design, Inc.*, 290 S.W.3d at 315–16.

Integ/Garza also claim that HCDD waived immunity by filing suit against them pursuant to *Reata Construction Corporation v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006). However, that waiver is limited to claims that are "germane to, connected with,

and properly defensive to 'claims that the entity asserts, except for the amounts that exceed the amounts necessary to offset the governmental entity's claim.'" *Id.* at 376–77 (quoting *Kinnear v. Tex. Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex. 2000) (per curiam)). When

> the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs. If the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted. Therefore, a determination that a governmental entity's immunity from suit does not extend to a situation where the entity has filed suit is consistent with the policy issues involved with immunity. In this situation, we believe that it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it.

*Id.* at 375–76. Accordingly, a governmental entity retains its immunity from suit as to those claims that are not germane to, connected with, and properly defensive to the entity's claim. *Id.*; *see also Tex. Dept. of Transp. v. Crockett*, 257 S.W.3d 412, 415 (Tex. App.—Corpus Christi–Edinburg 2008, pet. denied).

## B.    $84,000 Claim for Services

Integ claims that HCDD owes it $84,000 under the MCA that remains unpaid and asserts a claim for quantum meruit for sums paid on the DHS contract to the extent those sums are disallowed in further proceedings. According to Briones, Integ sent a bill for services dated January 28, 2014 for $84,000 for his construction management fee for work on the Raymondville Drain project. He requested payment, but Briones refused to place it on the consent agenda. Garza requested approval of a budget amendment to the district general fund in the amount of $84,000. Briones told Garza that the budget

36

approval request would need to be placed on the public agenda if he wanted it paid. Garza did not ask that Integ's budget approval request be placed on the public agenda.

There is no dispute that the MCA is a "contract subject to this subchapter" as defined in local government code § 271.151. However, HCDD argues that the monies Integ wants paid are based on engineering work, not construction management, and therefore, his claim is not one for relief under the MCA for which immunity is waived. In addition, HCDD notes that the Raymondville Drain project was not constructed by the time Garza left HCDD. Thus, according to HCDD, the trial court properly granted its plea to the jurisdiction. Garza argues that he is entitled to payment under his contract, the District waived immunity, and the trial court erred by sustaining the plea to the jurisdiction on this claim.

The record includes divergent expert opinions on the meaning of the contract term "actual construction costs." Crain, in particular, opined that "actual construction costs" included everything except land acquisition costs. Crain's testimony supports a finding that Garza's engineering work is properly payable under the MCA. Accordingly, there is a fact question that causes the merits of the case to be intertwined with the question of subject matter jurisdiction. *See Miranda*, 133 S.W.3d at 227–28; *see also City of Corpus Christi v. Scorpio Dev., LLC*, No. 13-13-00445-CV, 2014 WL 1007880, *3 (Tex. App.—Corpus Christi–Edinburg Mar. 13, 2014, no pet.) (mem. op.). As a result, the trial court erred by granting the plea to the jurisdiction as to Integ/Garza's counterclaim for $84,000. We sustain in part Integ/Garza's first issue as to their counterclaim for $84,000.

As to Integ/Garza's claim for quantum meruit, it may also properly be germane to

HCDD's claims against Integ/Garza. Like Integ/Garza's counterclaim, there is contested evidence in the record about whether some of the DHS project was merged into the Phase II of the master drainage project. *See Asher Grp, LLC v. City of Anahuac*, 472 S.W.3d 370, 377–78 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Thus there is a fact issue as to whether the quantum meruit claim was "germane to, connected with, and properly defensive to" HCDD's affirmative claims. *See Reata* , 197 S.W.3d at 376–77. The trial court erred by granting HCDD's plea to the jurisdiction on this issue. We sustain in part Integ/Garza's first issue as to their quantum meruit claim.

## C.     Failure to Procure Insurance

Integ/Garza argue that HCDD breached the MCA by failing to obtain insurance coverage. They seek attorney's fees they incurred defending against HCDD's claims which they claim would have been covered had HCDD properly obtained coverage. Integ/Garza contend that HCDD waived immunity against this claim by suing them.

HCDD argues in part that Integ/Garza's claim for damages from failure to procure insurance was a claim for consequential damages for which immunity was not waived under local government code Chapter 271. *See* TEX. LOC. GOV'T CODE ANN. § 271.153;[13]

---

[13]   Section 271.153 limits adjudication awards in pertinent part as follows:

(a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

   (1) the balance due and owed by the local governmental entity under the contract
   . . .
   (3) reasonable and necessary attorney's fees that are equitable and just; and
    . . .

(b) Damages awarded in an adjudication brought against a local governmental entity

38

*Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 110–11 (Tex. 2014) (concluding that Chapter 271 "does not waive immunity from suit on a claim for damages not recoverable under [§] 271.153"). HCDD further argued that it sued Integ/Garza to recover for fraud and other intentional acts and they should not be able to recover from HCDD by counterclaim for their own wrongdoing.

The MCAs specified that HCDD must provide Integ/Garza with general liability coverage and coverage for errors and omissions. Briones testified that she asked HCDD's agent if Garza/Integ were covered and was told that they were. However, coverage was denied. Although the MCA required HCDD to procure insurance, the MCA did not require that HCDD defend Integ or Garza. A case cited by HCDD is on point stating, "[a]lthough the insurance SWBT was obligated to maintain may have provided Coastal with a defense, nothing in the license agreement contemplated a separate obligation for SWBT to defend Coastal. Coastal was entitled to a defense only to the extent of SWBT's duty to maintain insurance." *Coastal Mart, Inc. v. Sw. Bell Tel. Co.*, 154 S.W.3d 839, 847 (Tex. App.—Corpus Christi–Edinburg 2005, pet. granted, judgm't vacated w.r.m.). Because the contract does not obligate HCDD to pay for Integ/Garza's defense, the damages Integ/Garza have requested under this claim are consequential damages, and immunity is therefore not waived. *See* TEX. LOC. GOV'T CODE ANN. § 271.153; *Zachry*, 449 S.W.3d at 110–11. As a result, the trial court properly

---

arising under a contract subject to this subchapter may not include:

> (1) consequential damages, except as expressly allowed under Subsection (a)(1);
>  . . .

TEX. LOC. GOV'T CODE ANN. § 271.153.

39

granted the plea to the jurisdiction on this claim. We overrule that part of Integ/Garza's first issue regarding their claim for defense costs.

## E. Lis Pendens on Integ's Real Property

In 2017, HCDD allegedly filed a lis pendens on real estate belonging to Integ/Garza. Integ crossclaimed for damages and attorney's fees it incurred as a result of the allegedly improper use of lis pendens. Although HCDD allegedly made a misrepresentation in the lis pendens that this suit involved title to real property, HCDD's pleadings in this action do not make such an allegation. Because there is no nexus between HCDD's claims against Integ/Garza and their counterclaims on the lis pendens, immunity is not waived under *Reata*. *See Reata,* 197 S.W.3d at 377 (holding immunity is waived for counterclaims that are "germane to, connected with and properly defensive to claims" asserted against the defendant); *see also City of Rio Grande City v. BFI Waste Servs. of Tex., LP.*, No. 04-15-00729-CV, 2016 WL 5112224, *8 (Tex. App.—San Antonio Sept. 21, 2016, pet. denied) (mem. op.) (holding abuse of process claim not related to contract claims for purposes of *Reata* waiver). The trial court properly granted HCDD's plea to the jurisdiction on this claim. We overrule Integ/Garza's first issue as it regards this claim.

## IV. CONTINUANCE

In light of our disposition of HCDD's other issues, we need not address HCDD's fifth issue on the trial court's denial of its request for continuance of the hearing on the motions for summary judgment. *See* TEX. R. APP. P. 47.1.

40

## V.     CONCLUSION

We reverse the trial court's summary judgment dismissing HCDD's claims for breach of fiduciary duty, fraud, and for breach of contract.   We also reverse the trial court's judgment dismissing Integ and Garza's counterclaims for $84,000, and quantum meruit.    We remand for further proceedings on these claims consistent with this memorandum opinion.    The remainder of the trial court's judgment is affirmed.


GINA M. BENAVIDES
Justice

Delivered and filed the
21st day of November, 2019.

41